NATIONAL LEAD COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 72491. Filed May 14, 1963

*Karl Riemer*, for the petitioner.

*Dean P. Kimball*, for the respondent.

ATKINS, *Judge:* The respondent determined a deficiency in income tax for the calendar year 1952 in the amount of $928,399.50. Certain issues have been disposed of by agreement of the parties. The principal issues remaining for decision are (1) whether the petitioner could effectively revoke or withdraw an election previously made by it under section 22(d)(6) of the Internal Revenue Code of 1939 to replace a Lifo zinc inventory involuntarily liquidated in 1950, where the attempted revocation or withdrawal was made prior to the expiration of the time for making the initial election; and (2) whether the petitioner sustained a deductible loss in 1952 on the payment to it by its wholly owned British subsidiary, in depreciated British currency, of the balance of the purchase price due for capital stock of another British corporation purchased from the petitioner by such subsidiary in 1937, and, if so, the amount thereof and whether the loss is an ordinary loss or a long-term capital loss. Also raised is the question whether the petitioner is taxable with respect to dividends on the stock of such other British corporation received by the subsidiary in 1952 and with respect to gains realized by the subsidiary upon sales of some of such stock in 1951 and 1952.

FINDINGS OF FACT

Some of the facts have been stipulated and are incorporated herein by this reference.

The petitioner is a corporation organized under the laws of the State of New Jersey with its principal office at 111 Broadway, New York, N.Y. It filed its income and excess profits tax return for the calendar year 1952 with the district director of internal revenue for Lower Manhattan, N.Y. It at all times material herein kept its books and reported income on an accrual method of accounting.

The petitioner at all times material herein has been engaged in the business of producing and selling paints and paint materials, pigments and chemicals, lead and lead alloy products, titanium and titanium alloy products, diecastings and other metal products, acid-handling equipment, oil well drilling materials, and other products.

Its stock is widely held and is quoted and traded on the New York Stock Exchange.

During the years material to this controversy, the petitioner maintained inventories of many classes of goods, including copper, other red metals, and zinc. In its income and excess profits tax return for the calendar year 1950, which was timely filed on September 14, 1951 (a 6-month extension of time having been granted), the petitioner employed the Lifo method of inventorying copper, other red metals, and zinc. The petitioner's opening and closing inventories of zinc, in pounds, for the calendar years 1950 through 1952 were as follows:

|  | 1950 | 1951 | 1952 |
|---|---|---|---|
| Opening | 6, 996, 212 | 3, 931, 958 | 8, 112, 897 |
| Closing | 3, 931, 958 | 8, 112, 897 | 3, 299, 753 |
| Increase (decrease) | (3, 064, 254) | 4, 180, 939 | (4, 813, 144) |

The decrease in the petitioner's closing zinc inventory from its opening zinc inventory in the calendar year 1950 was attributable to an involuntary liquidation, in that it was due to circumstances, occurrences and conditions, lacking a state of war, which were similar, by reason of a state of national preparedness, to those which would exist under a state of war. The petitioner's opening zinc inventory in 1950 cost it $749,504.19, or about $0.10713 per pound. The first 3,064,254 pounds of zinc purchased by the petitioner after December 31, 1950, cost it $581,840.35, or about $0.18988 per pound.

Under date of March 4, 1952, the petitioner's comptroller wrote a registered letter to the respondent, which was duly acknowledged by the respondent on March 12 and April 1, 1952, stating that the petitioner elected to invoke the provisions of section 22(d)(6) of the Internal Revenue Code of 1939 in connection with the involuntary liquidation during the year 1950 of 3,064,254 pounds of its zinc inventory, which had a base price of $0.10713 per pound, and of two other items of inventory, namely, copper and other red metals. Therein it was also stated that the petitioner made all reasonable effort to maintain these inventories during the calendar year 1950, but was unable to do so due to excessive demands on the normal sources of supply of nonferrous metals caused by the rearmament program.

It was the petitioner's desire and intention of March 4, 1952, based on the assumption that its Lifo inventories of zinc and other nonferrous metals might remain stable throughout 1952, to make a valid and timely election to replace the inventories involuntarily liquidated in the calendar year 1950. It then considered the election made by it on March 4, 1952, to be both a valid and a wise election.

By December 12, 1952, the petitioner's zinc inventory position and the market value of zinc, had changed materially from what they were at March 4, 1952. By this time it was clear that the petitioner

was going to have considerably less inventory of zinc on hand at the end of 1952 than it had at the time it made its election on March 4, 1952. Therefore, it was the petitioner's desire and intention on December 12, 1952, to withdraw or revoke its election to replace the zinc inventory, but not its election to replace the other two inventories, involuntarily liquidated during the calendar year 1950. Accordingly, the petitioner, by its comptroller, wrote a registered letter to the respondent under date of December 12, 1952, which was duly acknowledged by the respondent on February 6, 1953, stating that it thereby revoked its election to replace the 1950 zinc inventory liquidation in the amount 3,064,254 pounds, but that the original election with respect to the 1950 liquidation of the other two inventories continued in force.

In its return for the taxable year 1952 the petitioner included in opening inventory the full amount of $581,840.35, which was the cost of the first 3,064,254 pounds of zinc purchased in 1951 (instead of treating such amount as replacement of inventory involuntarily liquidated in 1950 and hence a part of cost of goods sold in 1950 as would have been the case had the petitioner adhered to the election made on March 4, 1952). In the notice of deficiency the respondent increased reported net income for the taxable year 1952 by the amount of $253,567.02, with the following explanation:

It has been determined that your claimed opening inventory for the year ended December 31, 1952, of $47,571,009.82 is overstated to the extent of $253,567.02 due to your improper revocation of a previous irrevocable election for the year 1950, to apply the involuntary liquidation and replacement provisions of section 22(d)(6) of the Internal Revenue Code of 1939 to certain zinc inventory. Accordingly, your taxable net income has been herein increased for the year ended December 31, 1952, by said opening inventory overstatement of $253,567.02.

The petitioner's opening zinc inventory for the calendar year 1952 was overstated by $253,567.02.

Hoyt Metal Co. of Great Britain, Ltd., hereinafter referred to as Hoyt Metal, a corporation organized under the laws of Great Britain with its principal office at London, England, has been a wholly owned subsidiary of the petitioner continuously since some time prior to December 1937. At all times material herein Hoyt Metal has been engaged in the business of producing and selling antifriction metals outside the United States.

Goodlass Wall and Lead Industries, Ltd., hereinafter referred to as Goodlass, is a corporation organized under the laws of Great Britain with its principal office at London, England, which at all times material herein has been engaged in the business, outside the United States, of producing and selling paints and paint materials, pigments and chemicals, lead and lead alloy products, diecastings, and other metal and nonmetal products. Its shares are widely held, being quoted and traded on the London Stock Exchange.

At December 14, 1937, the petitioner owned 421,036, or approximately 17.4 percent, of the ordinary shares of Goodlass which it had acquired in 1930, this representing approximately 12.7 percent of the voting stock of that corporation. On December 14, 1937, the adjusted basis of the Goodlass shares in the hands of the petitioner was the equivalent of $1,677,969.75 and the aggregate fair market value of such shares was £257,884 11s. (12s. 3d. per share), which was the equivalent of $1,288,938.56 based on the quotation of the pound sterling on that date of $4.998125.

On December 14, 1937, the then vice president and comptroller of the petitioner, who was also a member of petitioner's board of directors and executive committee, communicated by telephone to the then secretary of Hoyt Metal a request on behalf of the petitioner that Hoyt Metal make an offer to purchase from the petitioner the 421,036 shares of Goodlass stock at the current market price. The secretary of Hoyt Metal made such an offer on behalf of Hoyt Metal in that telephone conversation. On the same day the petitioner's board of directors authorized such sale. By letter of December 15, 1937, the petitioner's vice president and comptroller advised Hoyt Metal of petitioner's acceptance of its offer to purchase the stock at 12s. 3d. per share, offered to put Hoyt Metal's obligation for the purchase price on open account, and suggested that the board of directors of Hoyt Metal pass a resolution authorizing such purchase. This was done by the directors of Hoyt Metal on December 23, 1937, who agreed that, since the company did not have the necessary cash, the cost of such purchase be shown on the company's books as a debt due to the petitioner. On or prior to that date the certificates for the stock were delivered to Hoyt Metal together with assignments, and subsequently the stock was registered in Hoyt Metal's name.

The petitioner on its books recorded the transaction as a sale of the stock to Hoyt Metal, eliminating the stock from its asset accounts, and reflecting the selling price of $1,288,938.56 as an open account receivable from Hoyt Metal.

Hoyt Metal on its books recorded the transaction as a purchase of the stock from the petitioner, setting up the purchase price of £257,884 11s. as an investment and setting up the same amount as a liability owed to the petitioner. Its books at December 31, 1937, showed, in addition to such liability, a liability of £21,982 15s. 4d. to petitioner on account of unpaid dividends for prior years, or a total liability to petitioner of £279,867 6s. 4d. At that date its books showed total assets of £389,876 2s. 4d., including cash at bank and on hand of £3,359 16s. 11d. and the investment in Goodlass stock at a cost of £260,451 14s. 6d. (which included British stamp duty of £2,567 3s. 6d. paid by it on the transfer).

In its income tax return for the calendar year 1937 the petitioner claimed a loss in the amount of $389,031.19 on account of the sale of the Goodlass stock to Hoyt Metal. In such return it reported dispositions of capital assets, including the Goodlass stock, having an aggregate adjusted basis of $5,967,798.10, for an aggregate sales price of $5,986,964.10, resulting in a net long-term capital gain of $19,166. Upon examination of such return by the respondent no change was made in respect of any of these items.

During 1938 and 1939 no amounts became payable by Hoyt Metal to petitioner on account of dividends declared by Hoyt Metal. During those years Hoyt Metal made payments to or for the account of the petitioner aggregating £43,150 8s. During 1940 Hoyt Metal declared a dividend payable to the petitioner in the amount of £7,515 17s. 3d. and made payments aggregating £15,169 2s. 7d. to the petitioner. Of the amounts paid by Hoyt Metal to petitioner in the years 1938, 1939, and 1940, £28,820 18s. was applied against the purchase price of the Goodlass stock (the remainder representing payment of dividends for 1940 and for years prior to 1938). Accordingly, as of December 31, 1940, Hoyt Metal's books reflected an amount of £229,063 13s. owing to the petitioner in respect of the purchase price of the Goodlass stock.

After World War II minor adjustments aggregating £450 15s. 3d. in favor of Hoyt Metal were made in the books of both Hoyt Metal and the petitioner, reducing the amount of recorded indebtedness of Hoyt Metal to the petitioner on account of such purchase price to £228,612 17s. 9d. This amount of £228,612 17s. 9d., which was £29,271 13s. 3d. less than the original purchase price, continued to be reflected as due from Hoyt Metal to the petitioner on the books of both companies through December 31, 1951. This £29,271 13s. 3d. reduction of recorded indebtedness in respect of the Goodlass shares was the equivalent of $135,114.63 based on the prevailing rates of exchange on the dates of the payments and adjustments. It was the equivalent of $146,302.77 (or $11,188.14 more) based on the rate of exchange on the date of the original transaction, December 14, 1937. The petitioner's books at December 31, 1951, reflected, as its adjusted basis for the indebtedness owing to it from Hoyt Metal for the purchase price, the amount of $1,153,823.93, being $1,288,938.56 (the dollar equivalent of the original purchase price) less $135,114.63.

At no time material herein did Hoyt Metal pay any interest to the petitioner, nor did the petitioner demand any interest payments in respect of any indebtedness due or claimed to be due from Hoyt Metal to the petitioner. It is the petitioner's policy not to pay or receive interest with respect to indebtedness balances existing between it and its subsidiaries. The petitioner at no time prior to 1952 made any de-

mands upon Hoyt Metal for payment of the purchase price of the Goodlass stock.

In September 1951 Goodlass declared and paid a stock dividend of one share for each outstanding share. By virtue of this stock dividend Hoyt Metal received 421,036 shares of Goodlass stock, thereafter holding a total of 842,072 shares.

In December 1951, Hoyt Metal caused to be sold on the London Stock Exchange 46,000 shares of Goodlass stock for a net price of £50,022 which the respondent determined had a dollar equivalent at that time of $139,061.16. Thereafter Hoyt Metal held 796,072 shares of Goodlass stock, showing such shares as an investment on its books at December 31, 1951, at a cost of £246,224.

At various times beginning May 30, 1952, and ending November 13, 1952, the petitioner caused to be purchased for its own account, on credit through the London office of the Guaranty Trust Co. of New York, certain British Government bonds for an aggregate price of £228,612 17s. 9d.[1]

During the months of June, August, October, and November 1952, Hoyt Metal, at the instance and request of the petitioner, caused to be sold on the London Stock Exchange 243,350 shares of Goodlass stock for a total consideration of £228,707 3s. 10d., having a dollar equivalent, based on the rate of exchange at the times of sales, of $585,490.41. After each of these sales Hoyt Metal, at the instance and request of the petitioner, caused a remittance to be made to the London office of the Guaranty Trust Co. for the account of the petitioner, the aggregate of the remittances being £228,612 17s. 9d. Such remittances were, at the instance and request of the petitioner, applied by the Guaranty Trust Co. in full payment of its indebtedness incurred in the purchase of the British Government bonds. In the case of each such remittance both Hoyt Metal and the petitioner applied the respective amounts thereof to reduce the amount carried in their books as indebtedness owed by Hoyt Metal to the petitioner on account of the purchase price of the Goodlass stock. After the remittance made by Hoyt Metal on November 28, 1952, the books of both Hoyt Metal and the petitioner reflected no indebtedness owed by Hoyt Metal to

[1] Upon purchase of these British Government bonds the petitioner immediately exchanged them for West German deutsche marks, the aggregate amount obtained being DM3,876,710.20, having substantially the same value as the bonds exchanged. These transactions were part of a plan of the petitioner to obtain a sufficient number of West German deutschemarks to enable its wholly owned U.S. subsidiary, Titan Co., Inc. (which was engaged in managing and directing the operations of the petitioner's titanium companies in Europe), to purchase the full ownership of a West German company, Titangesellschaft, which was engaged in the manufacture of titanium pigments. The petitioner preferred not to expend American dollars for this purpose, but instead chose to make the purchase out of its and Titan's current accounts receivable abroad and from proceeds of sales of some of their investments abroad. Proceeds from some of these sales consisted of blocked sterling funds which could not be converted into American dollars except at a substantial discount. Titan purchased the deutsche marks from the petitioner at the prevailing exchange rates, making payment in dollars.

the petitioner. The remittances aggregating £228,612 17s. 9d., which were treated on the books of both the petitioner and Hoyt Metal as discharging the remainder of the purchase price of the Goodlass stock, had an aggregate dollar equivalent of $585,068.29, computed at the then rates of exchange, which averaged about $2.56 to the pound. The decrease in value of the pound from its 1937 value was due principally to its devaluation in 1949 by the British Government.

During the years 1938 to 1952, inclusive, Goodlass declared and paid dividends to Hoyt Metal in amounts aggregating £203,125 16s. 10d., net after United Kingdom income tax withheld, which dividends were retained by Hoyt Metal. In 1952 Goodlass declared dividends aggregating £43,377 15s. 2d. (the equivalent of $113,649.72) on its stock held by Hoyt Metal. From this amount United Kingdom income tax of £20,604 8s. 8d. (the equivalent of $53,983.62) was withheld, and £22,773 6s. 6d. (the equivalent of $59,666.11) was paid to Hoyt Metal.

During the years 1937 to 1942, inclusive, and 1945 to 1952, inclusive, Hoyt Metal had net profits, without regard to any dividends on, or gains from sales of, stock of Goodlass, aggregating £206,270 3s. 6d. Information as to such earnings for 1943 and 1944 is not available. Its net profit for 1937 was £14,327 10s. 3d.

During the period from 1940 to 1951, inclusive, Hoyt Metal declared and paid dividends to the petitioner in the net amount, after the withholding of United Kingdom income tax, of £204,449 17s. 3d. (the equivalent of $737,708.76). The petitioner reported these dividends for Federal income tax purposes. No dividends were paid in the years 1937, 1938, 1939, 1943, 1945, and 1952.

After the sales of Goodlass stock in 1952, Hoyt Metal held 552,722 shares of Goodlass stock, carrying such stock on its books at December 31, 1952, as an investment at a cost of £170,956 2s. 2d. In 1954 Hoyt Metal caused to be sold 25,000 of such shares. Thereafter, during 1954, Goodlass declared and paid a 50-percent stock dividend. At December 31, 1954, Hoyt Metal's books reflected the ownership of 791,583 shares of Goodlass stock, with a cost of £163,226 2s. 2d.

At a meeting of the board of directors of Hoyt Metal held on June 29, 1956, it was resolved that the company pay "rateably among its members a dividend out of its trading profits of £283,872 less Income Tax £120,646 making £163,226 nett and that payment of this dividend be satisfied by the transfer of the whole of the Company's holding of 791,583 units of * * * Stock in Goodlass * * *, the book value of which in the Company's books is £163,226." On June 30, 1956, certificates for 791,583 shares of Goodlass stock were caused by Hoyt Metal to be delivered to the London office of the Chase Manhattan Bank for the account of the petitioner. The fair market value of the stock on June 29, 1956, substantially exceeded £283,872. The books of Hoyt

Metal record the fair market value of this stock at December 31, 1955, as £1,306,112.

After 1956, at various times, the petitioner sold certain of the Goodlass stock resulting in the derivation by it of substantial gains, whether the basis of the shares be regarded as the adjusted basis thereof in its hands at December 14, 1937, or as the purported basis thereof in the hands of Hoyt Metal at June 29, 1956.

In its income and excess profits tax return for the calendar year 1952 the petitioner claimed, among "Other deductions authorized by law," the amount of $568,755.64 as a loss incurred upon the payment by Hoyt Metal of the remaining amount of indebtedness carried on the books representing the remainder of the purchase price of the Goodlass stock. It arrived at this amount by subtracting from $1,153,-823.93 (the amount carried on the books as the remaining basis of such indebtedness) the amount of $585,068.29 (which was the equivalent in dollars of the pounds paid by Hoyt Metal on petitioner's account in 1952), leaving as unrecovered basis the amount of $568,755.64.

In such return the petitioner reported no amounts as income to it on account of the receipt in 1952 by Hoyt Metal of dividends on, or proceeds from sales of some of, the Goodlass stock, nor did it report any amount as income in its 1951 return on account of the receipt in 1951 by Hoyt Metal of proceeds of sales of some of the Goodlass stock.

In the notice of deficiency the respondent disallowed as a deduction for 1952 the claimed loss of $568,755.64 with the following explanation:

It is held that your alleged sale of 421,036 ordinary shares of stock of Goodlass Wall & Lead Industries, Ltd. to your wholly owned foreign subsidiary, namely, Hoyt Metal Company of Great Britain, Ltd., on December 14, 1937, for the price of £257,884-11-0, is invalid for Federal income tax purposes for the reasons that such transaction was not bona fide and at arm's length and was without business purpose.

\* \* \* \* \* \* \*

Accordingly, it has \* \* \* been determined that your claimed foreign exchange losses, allegedly incurred on the payments made by your wholly owned subsidiary in settlement of the aforementioned purchase price, said losses totalling $11,188.14 for prior years and $557,567.50 for the current year, are not allowable under any provisions of the Internal Revenue Code of 1939.

In the alternative, if it is determined that your sale of the aforementioned 421,036 ordinary shares of stock of Goodlass Wall & Lead Industries, Ltd. to your wholly owned foreign subsidiary was a valid arm's length transaction, it is held that if any losses are allowable, only the sum of $557,567.50 applicable to current year payments may be considered properly allowable as a foreign exchange loss and then only to the extent of a long-term capital loss rather than as an ordinary loss as claimed on your return.

In the notice of deficiency the respondent also, for the same reason, determined that dividends in the amount of $59,666.11 paid by Goodlass to Hoyt Metal in 1952 were taxable to the petitioner, and increased

the petitioner's reported net income by that amount. The respondent also determined in such notice, for the same reason, that long-term capital gains of $68,681.16 and $213,164.91 were realized by the petitioner in the years 1951 and 1952, respectively, on account of the receipt by Hoyt Metal of proceeds of sales of 46,000 and 243,350 shares of Goodlass stock. He, therefore, made adjustments by reducing the petitioner's allowable capital loss carryover from 1951 from $108,557.36 to $39,876.20 and by adding $213,164.91 to the long-term capital gains reported by the petitioner in its 1952 return. In determining these amounts of capital gain realized by the petitioner, the respondent determined that the petitioner's adjusted basis of the 46,000 shares of Goodlass stock sold in 1951 was $70,380, and that its adjusted basis for the 243,350 shares sold in 1952 was $372,325.50.

Despite the transfer by the petitioner of the stock of Goodlass to Hoyt Metal on December 14, 1937, the petitioner continued, at all times material thereafter, to dominate and control the Goodlass stock through its ownership of all the stock of Hoyt Metal. The transfer of the Goodlass stock by the petitioner to Hoyt Metal in 1937 was without a business purpose. The sole purpose of the transfer was to reduce the petitioner's tax liability.

OPINION

The respondent has held, and contends, that the petitioner on March 4, 1952, made a valid election, pursuant to section 22 (d) (6) of the Internal Revenue Code of 1939,[2] to replace its zinc inventory

---

[2] The portion of section 22(d)(6) applicable to the instant case provides as follows:

SEC. 22. GROSS INCOME.

  (d) [METHOD OF INVENTORYING GOODS.]

     *       *       *       *       *       *       *

  (6) INVOLUNTARY LIQUIDATION AND REPLACEMENT OF INVENTORY.—

     *       *       *       *       *       *       *

    (F) Years ending after June 30, 1950, and prior to January 1, 1954.

      (1) Adjustment of net income and resulting tax.—If, for any taxable year ending after June 30, 1950, and prior to January 1, 1954, the closing inventory of a taxpayer inventorying goods under the method provided in this subsection [the so-called "last in, first out" or Lifo method] reflects a decrease from the opening inventory of such goods for such year, and if the taxpayer elects, at such time and in such manner and subject to such regulations as the Commissioner with the approval of the Secretary may prescribe, to have the provisions of this paragraph apply, and if it is established to the satisfaction of the Commissioner, in accordance with such regulations, that such decrease is attributable to the involuntary liquidation of such inventory as defined in subparagraph (B) (as modified by clause (ii) of this subparagraph), and if the closing inventory of a subsequent taxable year, ending prior to January 1, 1956, reflects a replacement, in whole or in part, of the goods so previously liquidated, the net income of the taxpayer otherwise determined for the year of such involuntary liquidation shall be increased by an amount equal to the excess, if any, of the aggregate cost of such goods reflected in the opening inventory of the year of involuntary liquidation over the aggregate replacement cost, or decreased by an amount equal to the excess, if any, of the aggregate replacement cost of such goods over the aggregate cost thereof reflected in the opening inventory of the year of the involuntary liquidation. The taxes imposed by this chapter and by chapter 2 for the year of such liquidation, for

involuntarily liquidated in 1950, and that such election was irrevocable under the specific terms of section 22(d)(6)(D) of the Code.[3]

The petitioner points out that in September 1952, the respondent promulgated regulations covering section 22(d)(6)(F) elections, permitting elections, for taxable years ending after June 30, 1950, and prior to March 1, 1952, to be made not later than December 15, 1952, and contends that its letter of December 12, 1952, being within the time prescribed for making initial elections, effectively "withdrew" its March 4, 1952, election and that "such withdrawal operated to nullify the March 4, 1952 purported election." It states on brief that the considerations governing finality and irrevocability of elections are those of fairness and equity, which, in this case, require that the petitioner's December 12, 1952, withdrawal of its "purported" election be given effect, and that the respondent's determination that the petitioner is irrevocably bound by its "purported" election of March 4, 1952, flies in the face of the purpose of the statute. It states that section 22(d)(6) was intended to afford relief to taxpayers, and that the statute is to be construed in the light of such purpose.

There can be no question, of course, that section 22(d)(6) was a relief provision.[4] However, Congress did not afford this relief un-

---

preceding taxable years, and for all taxable years intervening between the year of liquidation and the year of replacement shall be redetermined, giving effect to such adjustments. Any increase in such taxes resulting from such adjustments shall be assessed and collected as a deficiency but without interest, and any overpayment so resulting shall be credited or refunded to the taxpayer without interest.

(ii) Definition of involuntary liquidation.—For the purposes of this subparagraph the term "involuntary liquidation" shall have the meaning given to it in subparagraph (B) and, in addition, it shall mean a failure, as referred to in that subparagraph, on the part of the taxpayer due, directly and exclusively, to disruption of normal trade relations between countries. For the purposes of this subparagraph the words "enemy" and "war", as used in subparagraph (B), shall be interpreted, pursuant to regulations prescribed by the Secretary, in such a way as to apply to circumstances, occurrences and conditions, lacking a state of war, which are similar, by reason of a state of national preparedness, to those which would exist under a state of war.

[3] Section 22(d)(6)(D) provides as follows:

(D) Election irrevocable.—An election by the taxpayer to have the provisions of this paragraph apply, once made, shall be irrevocable and shall be binding for the year of the involuntary liquidation and for all determinations for prior and subsequent taxable years insofar as they are related to the year of liquidation or replacement.

[4] Subparagraph (F) was added to section 22(d)(6) of the Internal Revenue Code of 1939 by Pub. L. 919, approved January 11, 1951, for the purpose of providing for elections to replace inventories involuntarily liquidated in years ending after June 30, 1950, and prior to January 1, 1954. The parties have not directed us to any congressional committee reports with respect to Pub. L. 919 and we have found none. However, its fundamental purpose was the same as the purpose of paragraph (6)(A) of section 22(d) which was enacted by section 119 of the Revenue Act of 1942 (and later amended) to provide for such elections with respect to years beginning after December 31, 1940, and prior to January 1, 1948. The reasons for the enactment of paragraph (6)(A) of section 22(d) were set forth in S. Rept. No. 1683, 77th Cong., 2d Sess., p. 82, in part as follows:

"In this new section of the bill, your committee proposes to afford to taxpayers using the elective inventory method authorized by section 22(d) of the Code a measure of relief from the consequences of the involuntary liquidation of their base stock inventory resulting from prevailing war conditions.

"In the case of most taxpayers using the elective inventory method, the base stock inventory has been carried at the relatively low cost figures reflected in the purchases of

qualifiedly. It provided for an election to be made by the taxpayer and further provided that such election, once made, was irrevocable and binding for the year of the involuntary liquidation and for all determinations for prior and subsequent taxable years insofar as they are related to the year of liquidation or replacement. While the enactment of the statute was prompted by a congressional intent to give relief, the burden of deciding the more advantageous course was placed on the taxpayer, who must suffer the consequences of unforeseen contingencies or errors of judgment in its exercise of the election. See *Burke & Herbert Bank & Trust Co.*, 10 T.C. 1007, and cases cited therein. Congress did not guarantee that taxpayers electing under section 22 (d) (6) (F) would necessarily obtain a tax benefit.

Section 22 (d) (6) (F) provided for an election "at such time and in such manner and subject to such regulations as the Commissioner with the approval of the Secretary may prescribe." At the time the petitioner notified the respondent of its election, March 4, 1952, the Commissioner had not issued his regulations implementing this subpargaraph of the statute. It was not until September 24, 1952, that the respondent filed with the Division of the Federal Register T.D. 5932 (approved September 22, 1952), amending section 29.22 (d)–7 of Regulations 111 to provide that at any time not later than December 15, 1952, a taxpayer could elect to have the involuntary liquidation and replacement provisions applicable with respect to any inventory decrease for taxable years ending after June 30, 1950, and before March 1, 1952. At the time the petitioner made its election the only regulations in existence were those relating to involuntary liquidations made in prior years (and not applicable to 1950 and later years), which provided for the making of an election not later than 6 months after the filing of the return for the year of involuntary liquidation, and also provided for a reasonable extension of time for the making of elections at the discretion of the Commissioner. See sec. 19.22(d)–7, Regs. 103, and sec. 29.22(d)–7,

---

1938, 1939, and 1940. Under the elective inventory method, and so long as conditions remained normal and the taxpayer continued in the same business, these low cost figures would never enter, for tax purposes, into the computation of the cost of goods sold. The goods on hand at the close of the taxable year are treated as being those on hand at the beginning of the taxable year.

"As the direct consequences of prevailing war conditions beyond the control of taxpayers, many base stock inventories are now being depleted. Taxpayers are not able, or are not permitted by the Government, to maintain their normal stock of merchandise. The enforced liquidation of the low cost base stock inventory would subject the taxpayer under the present provisions of the Code to a tax burden not contemplated by Congress in the enactment of the elective inventory provisions. Your committee believes that the taxpayer should not be subjected to an increased tax burden by reason of the unavoidable liquidation or the change in form of its base stock inventory. It is proposed to permit the taxpayer in years ending subsequent to the year of liquidation, but not later than 3 years after the termination of the war, to replace, for tax purposes, items of merchandise liquidated from its base stock inventory at their original inventory figures, charging to income for the year of liquidation any excess costs to which it may be subjected in effecting the replacement and adding to income for the year of liquidation any excess of the original inventory figure over the actual replacement costs ultimately incurred. * * *"

Regs. 111, as amended by T.D. 5841 (approved May 22, 1951, and filed with the Division of the Federal Register on May 24, 1951).

The petitioner filed its return for 1950 on September 14, 1951. Its election of March 4, 1952, was made on the assumption that its Lifo inventory of zinc would remain stable throughout 1952, whereas by December 12, 1952, its zinc inventory position and the market value of zinc had changed materially from what they were at March 4, 1952, and it was apparent that it was going to have considerably less inventory of zinc on hand at the end of 1952 than it had on March 4, 1952. Accordingly, the petitioner decided on December 12, 1952, that it was not to its advantage to invoke the replacement provisions of the statute, and advised the respondent that it revoked its election.

On brief the petitioner appears to question whether the action taken on March 4, 1952, constituted an election within the meaning of the statute. For example, it refers to the "purported" election and queries in a footnote whether an election required to be made "under regulations" is still an "election," if the respondent has afforded no guidance by issuing regulations. However, the petitioner's comptroller testified that by the letter of March 4, 1952, it was intended to make a valid and timely election to replace the inventories involuntarily liquidated in the calendar year 1950, and that it was then considered that the election was both a valid and a wise election. Furthermore, in the same letter the petitioner made an election to replace its inventories of copper and other red metals which had been involuntarily converted in 1950, and the petitioner adheres to its election with respect to those metals.

The petitioner on brief seems to also contend that its election could be withdrawn or vitiated, because it was based upon a mistake of fact, namely, the assumption by its comptroller in March 1952 that the zinc inventory would remain stable quantity-wise and price-wise throughout 1952. It is true that under general principles relating to elections, an electing party is not bound by an election made under a mistake of fact. See *McIntosh* v. *Wilkinson*, (E.D. Wisc.) 36 F. 2d 807, and authorities cited therein. However, the mistake of fact referred to is a mistake of existing fact. Clearly the petitioner did not elect under any mistake of existing fact, and hence the mistake is not of the type which would permit it to repudiate its election. It may also be pointed out that in the very nature of the election provided by the statute in question, the taxpayer may find it necessary to exercise judgment with respect to the probable effects of future events. See *Aeolian Company of Missouri* v. *United States*, (C.A. 8) 257 F. 2d 24. It may be further pointed out that the petitioner has not shown, nor does it claim, that there were any subsequent statutory enactments which, if in existence at the time the election was made, would have

influenced it to refrain from making the election.[5]  It is true that the petitioner did not know at the time the election was made how long a time he would have under the prospective regulations to make the election, but it reasonably could have been anticipated that when the regulations were promulgated they would provide some time after their promulgation in which to make the election.  Finally, it should be stated that the election made by the petitioner was made at such time and in such manner as was provided by the regulations which were later promulgated.  Under such circumstances, it seems clear that the election made by the petitioner on March 4, 1952, was a valid and binding election under section 22(d)(6)(F) of the Code.

The petitioner refers to numerous cases, including those holding that the right of taxpayers to file joint returns is not precluded by the fact that separate returns had been previously filed for the same year (see *McIntosh* v. *Wilkinson, supra*) ; those holding that a corporate taxpayer may, in a timely filed amended return, declare a value of capital stock for purposes of the capital stock and declared value excess profits taxes despite the fact that a different value was declared in the corporation's original return (see *Haggar Co.* v. *Helvering*, 308 U.S. 389) ; and those holding that the right of taxpayers to claim a credit against tax for taxes paid to foreign governments is not precluded by the fact that a deduction of foreign taxes paid had been previously claimed for the same year (see *Gentsch* v. *Goodyear Tire & Rubber Co.*, (C.A. 6) 151 F. 2d 997).  We do not consider those cases as being applicable here.  None of them involved a statute which specifically provided for an "election" between two or more courses of action.  Neither the statutory provisions permitting married taxpayers to file joint returns or separate returns nor those permitting taxpayers to claim a deduction or a credit against tax on account of foreign taxes paid provided that a choice once made should be irrevocable or binding.  The statute imposing the capital stock and declared value excess profits taxes and requiring a declaration of value of capital stock provided that the declaration of value (which could not be amended) should be made in the corporation's "first return" under the statute, and the Supreme Court merely held that the "first return" under the statute included a timely filed amended return. The petitioner also cites *Meyer's Estate* v. *Commissioner*, (C.A. 5)

---

[5] The petitioner introduced in evidence a ruling made by the respondent to another taxpayer permitting the withdrawal, prior to December 15, 1952, of an election previously made to invoke the replacement provisions of section 22(d)(6)(F) of the Code.  This letter, of course, is not binding upon the respondent in the instant case, and the petitioner does not so contend.  The petitioner alludes to such ruling merely to show that administrative practice was not consistently applied to all taxpayers similarly situated.  However, we note that in the ruling letter to the other taxpayer it was shown that such other taxpayer claimed that subsequent to the filing of its election Congress enacted in July 1952 Pub. L. 594 which served to increase the taxpayer's excess profits credit and alleged that it would not have made the election had Pub. L. 594 been in existence when the election was made.

200 F. 2d 592, reversing 15 T.C. 850, in which it was held that an election to recognize gain under section 112(b)(7) in connection with a corporate liquidation was not binding and could be rescinded. However, that case is distinguishable not only because the statutory provision is different from that here involved but also because there, unlike the instant case, the original election was based upon a mistake of existing fact.

It is our conclusion that the election made by the petitioner on March 4, 1952, was a valid and binding election to invoke the provisions of section 22(d)(6) of the Code with respect to the replacement of petitioner's zinc inventory involuntarily liquidated in 1950. In view of the specific provisions of section 22(d)(6)(D) such election was irrevocable, and consequently the letter of December 12, 1952, was not effective to withdraw or revoke such election. We approve the respondent's determination in this respect.[6]

The petitioner contends that the respondent erred in disallowing as a deduction under section 23(f) of the Internal Revenue Code of 1939,[7] an ordinary loss of $568,755.64 claimed by the petitioner to have been sustained in 1952 upon the final satisfaction by Hoyt Metal of its indebtedness to petitioner on account of the purchase by it from petitioner of the Goodlass stock in 1937. The remaining indebtedness carried on the books of Hoyt Metal and petitioner at the beginning of 1952 on account of the Goodlass stock transaction was £228,612 17s. 9d. The books of the petitioner reflected an amount of $1,153,823.93 as the adjusted basis of the remaining indebtedness, representing (except for some adjustments and payments made in prior years) the dollar equivalent of the pounds at the rate of exchange at the time of the stock transfer in 1937. In 1952 when Hoyt Metal paid £228,612 17s. 9d. for the account of the petitioner the pound sterling was worth only about $2.56 due principally to the devaluation of the pound by the British Government in 1949, and thus the petitioner received in payment British currency worth in 1952 only $585,068.29. It contends, therefore, that it sustained a deductible loss of the remainder of the claimed adjusted basis of the indebtedness, namely, $568,755.64.

The respondent, on the other hand, determined in the notice of deficiency that the sale in 1937 by the petitioner of the Goodlass stock to Hoyt Metal, its wholly owned subsidiary, was invalid for Federal income tax purposes for the reason that such transaction was not bona fide and at arm's length and was without business purpose. On brief

[6] The parties have stipulated that if the respondent's determination is upheld on this issue, the petitioner's opening zinc inventory for 1952 was overstated by $253,567.02.

[7] Section 23(f) provides as follows:

SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

\*   \*   \*   \*   \*   \*   \*

(f) LOSSES BY CORPORATIONS.—In the case of a corporation, losses sustained during the taxable year and not compensated for by insurance or otherwise.

it is contended that not only should the loss claimed for 1937 on account of such sale have been disallowed,[8] but that the claimed loss for 1952 should be disallowed on the ground that the payment of the so-called indebtedness arising on account of that transaction should also be ignored and given no significance for tax purposes.[9] He relies principally upon *Higgins* v. *Smith*, 308 U.S. 473; *Crown Cork International Corporation*, 4 T.C. 19, affd. (C.A. 3) 149 F. 2d 968; and *Bank of America National Trust & Savings Assn.*, 15 T.C. 544, affd. (C.A. 9) 193 F. 2d 178.

In *Higgins* v. *Smith*, *supra*, the taxpayer was the sole owner of a corporation with which he carried on transactions of buying and selling securities. The taxpayer, as partial payment of an indebtedness to the corporation, sold shares of stock to it at market value, and in his return claimed as a deduction a loss on the transaction. The Supreme Court, in holding that the claimed loss deduction was not allowable, stated in part as follows:

Under Section 23(e) deductions are permitted for losses "sustained during the taxable year." The loss is sustained when realized by a completed transaction determining its amount. In this case the jury was instructed to find whether these sales by the taxpayer to Innisfail were actual transfers of property "out of Mr. Smith and into something that existed separate and apart from him" or whether they were to be regarded as simply "a transfer by Mr. Smith's left hand, being his individual hand, into his right hand, being his corporate hand, so that in truth and fact there was no transfer at all." The jury agreed the latter situation existed. There was sufficient evidence of the taxpayer's continued domination and control of the securities, through stock ownership in the Innisfail Corporation, to support this verdict, even though ownership in the securities had passed to the corporation in which the taxpayer was the sole stockholder. Indeed this domination and control is so obvious in a wholly owned corporation as to require a preemptory instruction that no loss in the statutory sense could occur upon a sale by a taxpayer to such an entity.

It is clear an actual corporation existed. Numerous transactions were carried on by it over a period of years. It paid taxes, state and national, franchise and income. But the existence of an actual corporation is only one incident necessary to complete an actual sale to it under the revenue act. Title, we

---

[8] In its 1937 return the petitioner claimed a loss of $389,031.19 upon the sale of the Goodlass stock to Hoyt Metal. Upon examination of such return the respondent did not disallow the claimed deduction. The respondent now contends that the allowance of that deduction was obviously erroneous in view of subsequent decisions, and he contends that although such error cannot now be corrected, the petitioner is not entitled to perpetuate and compound the error and claim still further benefit by means of a loss deduction in connection with the final satisfaction of the alleged debt. In this connection it should be noted that the respondent's failure to disallow the claimed loss for 1937 does not estop or preclude him from now taking the position that the transaction, including the purported creation of indebtedness, lacks reality and has no significance for tax purposes; nor does the petitioner contend to the contrary. *Automobile Club of Michigan* v. *Commissioner*, 353 U.S. 180; *Niles Bement Pond Co.* v. *United States*, 281 U.S. 357; *Caldwell* v. *Commissioner*, (C.A. 2) 202 F. 2d 112; and *Avco Manufacturing Corporation*, 25 T.C. 975.

[9] He contends that in any event $11,188.14 of the claimed loss should be disallowed as a deduction for 1952 because in prior years portions of the claimed indebtedness were satisfied by payments (and adjustments) in pounds of a value $11,188.14 less than the equivalent value of that number of pounds in 1937.

shall assume, passed to Innisfail but the taxpayer retained the control. Through the corporate forms he might manipulate as he chose the exercise of shareholder's rights in the various corporations, issuers, of the securities, and command the disposition of the securities themselves. There is not enough of substance in such a sale finally to determine a loss.

\* \* \* If \* \* \* the Gregory case is viewed as a precedent for the disregard of a transfer of assets without a business purpose but solely to reduce tax liability, it gives support to the natural conclusion that transactions, which do not vary control or change the flow of economic benefits, are to be dismissed from consideration.

\*       \*       \*       \*       \*       \*       \*

The Government may look at actualities and upon determination that the form employed for doing business or carrying out the challenged tax event is unreal or a sham may sustain or disregard the effect of the fiction as best serves the purposes of the tax statute. To hold otherwise would permit the schemes of taxpayers to supersede legislation in the determination of the time and manner of taxation. It is command of income and its benefits which marks the real owner of property.

In *Crown Cork International Corporation, supra,* we upheld the respondent's disallowance of a loss claimed by a corporate taxpayer upon the sale by it of securities to its wholly owned subsidiary. We there recognized that section 24(b)(1) of the Internal Revenue Code of 1939, which sets forth a number of situations in which losses from sales or exchanges are to be disallowed as deductions, does not refer to transactions between corporations where neither is a personal holding company. However, we there pointed out that the Ways and Means Committee Report accompanying the Revenue Act of 1937 (H. Rept. No. 1546, 75th Cong., 1st Sess., p. 26) makes it clear that the statutory provision "is not exclusive," and that it was not intended "to imply any legislative sanction of claiming deductions for losses on sales or exchanges in cases not covered thereby, where the transaction lacks the elements of good faith or finality, generally characterizing sales and exchanges of property." We there also recognized that not all transactions between a wholly owned corporation and its parent are to be disregarded, but stated:

But where either the relationship between the two is such that they are in fact inseparable, so that the individual existence of the two entities is an unsupported fiction and the "finality" the loss to the combined enterprise is consequently negatived, cf. *Interstate Transit Lines* v. *Commissioner*, 319 U.S. 590, or the transaction itself is without a true purpose except that of tax avoidance, so that its effectiveness to "change the flow of economic benefits," its "good faith," as an incident of the conduct of a business, is suspect, cf. *Wickwire* v. *United States* (C.C.A., 6th Cir.), 116 Fed. (2d) 679, then taxpayers have failed to show themselves entitled to the benefit of the loss.

\*       \*       \*       \*       \*       \*       \*

it is clear that the burden of proving any facts favorable to it in this respect [the relationship between the parent and subsidiary] has not been borne by petitioner and, consequently, the record would warrant only a finding that the subsidiary is under the complete domination and control of petitioner, and that

there is in substance no distinction between the two. *Southern Pacific Co.* v. *Lowe*, 247 U.S. 330; *North Jersey Title Ins. Co.* v. *Commissioner* (C.C.A., 3d Cir.), 84 Fed. (2d) 898. It would follow that a transfer from one to the other was no more than a shifting from one department or branch to another of the same entity, and hence that the loss is utterly lacking in finality. On that ground alone, its disallowance would be required.

More than this, however, we are faced with a lack of any business purpose for the transaction necessary to justify the recognition of loss resulting from it. * * *

\* \* \* \* \* \* \*

there is absent from the record any suggestion of a possible business purpose on the part of petitioner, the parent, for the transfer of these securities. The only motive shown is that described by the stipulation—"to secure a tax saving." That is not sufficient to avoid the impact of the *Gregory* case "as a precedent for the disregard of a transfer of assets without a business purpose but solely to reduce tax liability." *Higgins* v. *Smith, supra.*

It seems to us to follow that no loss was sustained by petitioner upon the transaction in controversy which is cognizable as matter of tax liability; and that this is so not solely because petitioner's wholly owned subsidiary was the other participant, but rather by reason of the domination and control exercised over the actions of the subsidiary, and because on this record the principal and indeed the only motive for the transfer from parent to wholly owned affiliate was that of avoiding taxes, with no true business purpose shown or even suggested. In those circumstances the transaction must, for tax purposes, be characterized as sham, unreal, and lacking in good faith and finality, and, consequently, as one which it was not the intention of the lawmakers to include among deductible losses. *Gregory* v. *Helvering*, 293 U.S. 465.

In the instant case the petitioner, upon which rests the burden of proof, has not shown that it did not actually exercise domination or control over its wholly owned subsidiary, Hoyt Metal, although it argues that it cannot be concluded that a widely held major U.S. corporation, such as the petitioner, can exercise unfettered control of a British subsidiary conducting an active business abroad under authority of the British Government. However, upon the evidence adduced, we must conclude that the petitioner did, in fact, exercise substantial domination and control over the subsidiary, in view of the evidence with respect to the relationship between them in respect to the Goodlass stock. It seems clear that the petitioner exercised complete domination and control over the subsidiary in that respect. In the first place, a representative of the petitioner by telephone "requested" Hoyt Metal to make an offer to purchase the Goodlass stock from the petitioner, and such offer was made by the representative of Hoyt Metal in the same telephone conversation. The petitioner also "suggested" that the board of directors of Hoyt Metal pass a resolution authorizing such purchase. At that time the subsidiary was unable to pay for the stock, having cash of only about 3,360 pounds and total assets of only about 130,000 pounds, whereas the selling price was about 257,885 pounds. As a consequence the selling price was carried on petitioner's books as an open account, without interest.

It is true that the subsidiary did conduct a business which produced earnings, but these were relatively small, its net earnings for 1937 amounting to only 14,300 pounds. It may be added that it was at petitioner's instance and "request" that in 1952 Hoyt Metal disposed of some of the Goodlass stock and remitted substantially all of the proceeds to a bank for the petitioner's account (such proceeds being applied to discharge the petitioner's indebtedness to the bank for the purchase of British Government bonds), and thereby satisfied its obligation for the remaining purchase price of the Goodlass stock.[10]

In view of the above we do not consider that lack of actual domination and control of the Goodlass stock is established by the facts, to which the petitioner alludes, that the usual formalities with respect to the transfer of stock (such as registration of the shares in the name of Hoyt Metal, the holding of the certificates by Hoyt Metal in Great Britain, and the recording of the stock as an asset on Hoyt Metal's books) were observed, that dividends on the Goodlass stock were paid to Hoyt Metal as the registered owner of the stock and retained by it as such, and that the proceeds of a sale of some of the Goodlass stock in 1951 were retained by Hoyt Metal.

Furthermore, there is no suggestion whatever in the record that the sale of the Goodlass stock to Hoyt Metal in 1937 had any business purpose from the standpoint of either the petitioner or its subsidiary. At the hearing and on brief counsel for the petitioner conceded that there was a tax motivation behind the 1937 sale, namely, to claim a tax loss to offset some of the gains that the petitioner had derived. Since no other purpose has been urged or proved, it appears that the only purpose was a tax-saving purpose. Accordingly, we have found as a fact that the transfer was without a business purpose, and that the sole purpose for the transfer was to reduce the petitioner's tax liability.

Under these circumstances, it is our conclusion that the sale in 1937 of the Goodlass stock by the petitioner to Hoyt Metal, its wholly owned subsidiary, did not vary control of the stock or change the flow of economic benefits of the ownership of such stock, and that it therefore lacked substance and must be disregarded for tax purposes. It follows, therefore, that there was not such finality to the sale as to support the claimed deduction in 1937 of a loss sustained in connection therewith.

The petitioner on brief apparently concedes that the loss deduction claimed for 1937 would have been denied, if challenged, but contends

---

[10] To complete the picture, it may be also added that in 1956 Hoyt Metal declared a dividend of about 283,900 pounds, payment thereof to be satisfied by transfer of the remainder of the Goodlass stock which it held; that the stock had a fair market value substantially in excess of such amount, the petitioner's books showing that such stock had a fair market value at December 31, 1955, of about 1,300,000 pounds; and that the petitioner thus received back the remainder of such stock.

that this has no bearing upon the question whether a loss was sustained by the petitioner upon collection in 1952. It is contended that the 1937 transaction did, in fact, take place, pointing out that in *Higgins* v. *Smith, supra,* the Court did not say or hold that the sale never took place, but, rather, assumed that title passed. It argues, therefore, that a debt was in reality created, this being recognized by the parties to the transaction on their books throughout the years 1937 to 1952, and that in reality payment of the debt was completed in 1952. It states, relying, among other cases, upon *Hale* v. *Helvering,* (C.A.D.C.) 85 F. 2d 819, that the collection of a debt is a transaction separate and apart from the transaction giving rise to the debt, and that upon collection a creditor recognizes gain to the extent that the proceeds of collection exceed his basis for the debt, and loss to the extent his basis exceeds the proceeds. It also states that when services are performed, or mechandise or other property is sold, in a foreign country for consideration payable in foreign exchange, an accural basis taxpayer properly includes the consideration in his gross receipts at a valuation determined by the rate of exchange prevailing on the date of accrual, and that this establishes the basis of his debt for subsequent computation of gain or loss when the debt is paid, citing among other cases *Foundation Co.,* 14 T.C. 1333. It, therefore, urges that when it sold its Goodlass stock to Hoyt Metal it accrued the purchase price as gross receipts, that its basis for the debt was then and there established for subsequent computation of gain or loss when the debt was paid, and that under the circumstances here it sustained a loss upon such payment. It states that it cannot be said that this loss was tainted with any "tax motivation" since the cause of the loss was the devaluation of the pound sterling, a circumstance completely extraneous to the parties.

It is true, as the petitioner states, that in *Higgins* v. *Smith, supra,* the Supreme Court did not deny that the transfer actually took place between separate entities, but nevertheless it held that because of the lack of business purpose and the continued domination and control, through stock ownership, of the property transferred, the transfer lacked substance and finality and should be disregarded or dismissed from consideration for tax purposes. In that case, as well as in *Crown Cork International Corporation, supra,* the consideration was paid in the year of sale, whereas in the instant case the consideration was not paid in the year of sale, but was carried for years as an open account and was finally paid in 1952. Certainly, we think, this difference in facts does not require a different conclusion in the instant case. Here, as in those cases, no loss should have been recognized at the time of the original transfer; and the final payment of the purchase price in the instant case in 1952 no more effectively rendered the transaction a final or closed transaction than did the payments in the

cited cases in the year of the transfer. Here Hoyt Metal agreed to pay a specified number of pounds, at no particular time and at no particular rate of exchange. Such agreement was an inherent part of the 1937 transaction, and, like the transfer itself, had no business purpose and lacked substance. The obligation to pay cannot be considered as a valid indebtedness for tax purposes. Accordingly, the payment made in 1952 lacked substance for tax purposes and must be disregarded. Through the years, and including the year 1952, the petitioner continued to be the sole owner of Hoyt Metal and to dominate and control the Goodlass stock. It may be further pointed out that since the original transaction in 1937 is to be ignored for tax purposes, it cannot be considered that Hoyt Metal's obligation acquired a basis for the purpose of subsequent calculation of gain or loss upon payment as would be true in the case of a taxable transaction (see *Foundation Co., supra*); and for this reason the payment is not to be considered, for tax purposes, as a transaction separate and apart from the transfer in 1937.

Accordingly, we hold that the respondent properly disallowed the claimed deduction of $568,755.64 for the year 1952.

There remain the questions whether for the year 1952 the respondent erred in taxing to the petitioner dividends paid on the Goodlass stock in that year, but received by Hoyt Metal, in the amount of $113,649.72, and whether the respondent properly determined that sales of Goodlass stock made by Hoyt Metal on the London Stock Exchange in the years 1951 [11] and 1952 resulted in the realization by the petitioner in those years of long-term capital gains in the respective amounts of $68,681.16 and $213,164.91. These dividends and gains were attributed by the respondent to the petitioner on the ground that in reality the petitioner continued to be the owner of the Goodlass stock, for tax purposes, despite the sale of the Goodlass stock to Hoyt Metal in 1937. The petitioner urges that the transfer of stock to Hoyt Metal was real and that therefore it, the petitioner, need not include in its gross income either the dividends or any gains on the sales of the Goodlass stock.

We have concluded above that the sale of the Goodlass stock by the petitioner to Hoyt Metal in 1937 did not vary control of the stock or change the flow of economic benefits of the ownership of such stock, and that therefore the sale must be disregarded for tax purposes. Here, in the language of the Supreme Court in *Higgins* v. *Smith, supra*, the petitioner, because of its domination and control over the Goodlass stock through its ownership of all the stock of Hoyt Metal, could manipulate as it chose the exercise of shareholder's rights in Goodlass and command the disposition of the stock itself, and under

---

[11] The taxable year 1951 is not before us except for decision as to the allowable capital loss carryover from that year to the taxable year 1952.

these circumstances there was not completed an actual sale for purpose of the revenue statute. We think that the principle of *Higgins* v. *Smith, supra,* requires the conclusion that the transfer is to be disregarded or dismissed from consideration for *all* purposes of application of the taxing statute.

The case of *Commissioner* v. *Smith,* (C.A. 2) 136 F. 2d 556, reversing in part 42 B.T.A. 505, involved the same taxpayer as was involved in *Higgins* v. *Smith, supra,* and one of the questions presented was whether the taxpayer was taxable upon dividends upon stock which he had transferred to his wholly owned corporation (upon which transfer the Supreme Court had held that no loss was deductible). The Court of Appeals stated that the scope of *Higgins* v. *Smith, supra,* was not limited to merely the disallowance of a loss claimed by the taxpayer upon a sale of securities to his wholly owned corporation, and held that the taxpayer was taxable upon the dividends in question. Cf. *William C. Hay,* 2 T.C. 460, affd. (C.A. 4) 145 F. 2d 1001, certiorari denied, 324 U.S. 863, a case involving a factual situation different from that here obtaining, but in which this Court also, following *Commissioner* v. *Smith, supra,* took the position that the doctrine of *Higgins* v. *Smith, supra,* is not limited to cases involving a claimed loss deduction by an individual upon his sale of property to his wholly owned corporation. It is true that in *Commissioner* v. *Smith, supra,* the Court of Appeals in effect ignored the corporate entity for tax purposes by consolidating its income with that of its sole stockholder, stating that it need go no farther than to say that there was no substantial business reason for its creation or continued existence since its only, or, at least, its main object was to furnish the owner of all its stock with a means of diminishing his taxes. In the instant case, of course, it cannot be concluded that Hoyt Metal's only, or even its main, object was to diminish the petitioner's taxes, since it did carry on a bona fide business. However, as pointed out above, with respect to the Goodlass stock Hoyt Metal was utilized only for the tax advantage of the petitioner, insofar as the record shows. Under the circumstances, we think that for tax purposes it must be considered that the petitioner continued to own the Goodlass stock in 1951 and 1952. See *Corliss* v. *Bowers,* 281 U.S. 376, and *Griffiths* v. *Helvering,* 308 U.S. 355. In the latter case the Supreme Court stated in part:

> We cannot too often reiterate that "taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed—the actual benefit for which the tax is paid." Corliss v. Bowers, 281 U.S. 376, 378, 50 S.Ct. 336, 74 L.Ed. 916. And it makes no difference that such "command" may be exercised through specific retention of legal title or the creation of a new equitable but controlled interest, or the maintenance of effective benefit through the interposition of a subservient agency. * * *

We hold that the respondent properly determined that dividends paid on such stock in 1951 were taxable to the petitioner,[12] and that upon sales of the stock in 1951 and 1952 taxable gain was derived by the petitioner in the amounts determined by the respondent.[13]

*Decision will be entered under Rule 50.*

[12] The parties have stipulated that if, as we have held, the petitioner is taxable in 1952 on dividends on the Goodlass stock, it is entitled to the benefit of a foreign tax paid credit in the amount of $53,983.62.   See sec. 131, 1939 Code.

[13] The respondent used as a basis for calculation of gain the original basis of the Goodlass stock in the hands of the petitioner, reduced by the loss claimed by the petitioner, and allowed by the respondent, upon the transfer of the stock to Hoyt Metal in 1937.   The petitioner raises no question as to the propriety of the use of such adjusted basis.   In any event, such adjustment is supported by the holding in *Commissioner* v. *Smith,* (C.A. 2) 136 F. 2d 556.