LEONARD C. KLINE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

CLAYTON E. KLINE AND KATHRYN A. KLINE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 24161, 24162. Promulgated December 29, 1950.

*Lancie L. Watts, Esq.*, for the petitioners.
*Marvin E. Hagen, Esq.*, for the respondent.

## OPINION.

LeMire, *Judge:* Our first question is whether the gains from the sale of the so-called JA cows are taxable in full as ordinary income, as respondent has determined, or at the capital gains rate under section 117 (j), Internal Revenue Code.[1] Respondent's position is that the cattle in question were held for sale to customers in the regu-

---

[1] SEC. 117. CAPITAL GAINS AND LOSSES.

*    *    *    *    *    *    *

(j) GAINS AND LOSSES FROM INVOLUNTARY CONVERSION AND FROM THE SALE OR EXCHANGE OF CERTAIN PROPERTY USED IN THE TRADE OR BUSINESS.—

(1) DEFINITION OF PROPERTY USED IN THE TRADE OR BUSINESS.—For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business    *    *    *.

lar course of business as feeder cattle and not for breeding purposes as petitioners contend.

For a number of years petitioners conducted their ranch principally as a feeder operation. They purchased beef cattle which they grazed or fed until ready for market and sold them to the trade as beef cattle. They purchased a large number of cows each year from the JA Ranch in Texas. These, for the most part, were 8-year-old cows that had served their usefulness as breeding cattle at the JA Ranch. Petitioners found that by keeping them on their ranch for a period of six months to a year they could harvest a crop of calves from them and still sell them on the beef market at a profit. It was for this purpose that petitioners purchased the "5 JA," "7 JA," and "10 JA" cows in 1943, 1944, and 1945, from which the sales in dispute were made in 1945 and 1946.

The fact that petitioners purchased these cows with the intention of harvesting a single crop of calves from them before putting them on the beef market does not establish that they purchased or used them as breeders, as distinguished from feeder cattle. Feeding and marketing the cows for beef might still have been and, we think, was petitioners' predominant purpose. As to this breed of cattle, petitioners had long been conducting a strict feeder operation. They did maintain a small herd of Milking Shorthorns and another of Angus but they are not involved here. As to the Herefords, petitioners' established practice was to purchase from the JA Ranch each year a group of old cows, feed or graze them for a few months, and sell them for beef. The only departure from that practice, as to the matter in controversy here, was in 1943 when they began holding over most of these cows for a few months in order to harvest a spring calf crop from them. The evidence is that even the calves from these cows, or most of them, were fed and sold as beef cattle, although some unknown number of heifer calves were added to the breeding herd each year. The inventory figures as of May 8, 1950, give some insight into this phase of the operations in later years. For instance, they show that on that date, May 8, 1950, petitioners had on hand in the JA cattle groups 355 cows purchased in 1949, 100 calves raised on the ranch, and 135 heifers and 153 steers raised from the calf crop of 1949. They also had 172 Hereford cows, raised from the 1948 JA calf crop, and 142 calves raised from them. They also had 270 miscellaneous yearling heifers purchased from the JA Ranch in 1949. Thus, it is seen that petitioners had on hand no JA cows or calves from JA cows which they had held for more than about two years.

A cow does not reach her maturity as a breeder until about two years of age. There is no evidence that there is or has ever been any common practice in the cattle industry of regularly selling cows

from a breeding herd on the beef market after they have produced one calf. All of the JA cattle involved in this dispute were purchased and sold on a per pound basis as feeder cattle. Breeder cattle of an established breed usually sell for a much higher price.

Petitioners rely strongly upon *Albright* v. *United States*, 173 Fed. (2d) 339, and the several cases in which we followed that case, including *Isaac Emerson*, 12 T. C. 875, and *Fawn Lake Ranch Co.*, 12 T. C. 1139. Those cases, we think, are distinguishable. In the *Albright* case the petitioner maintained his own dairy herd and sold off the surplus cows and calves from time to time. In holding that the profits from such sales were taxable as capital gains, the court said:

* * * A dairy farmer is not primarily engaged in the sale of beef cattle. * * * Such sales as he makes are incidental to his business and are required for its economical and successful management. * * *

Petitioners here were engaged primarily in the sale of beef cattle. They were not raising these cattle from their own herd, that is, not the JA cattle, but were purchasing them. The JA Ranch and not petitioners were the breeders. One of petitioners testified in this proceeding that the cows which they purchased from JA Ranch showed improvement each year.

We can reach no other conclusion on the evidence here than that petitioners purchased the JA cows primarily as feeder cattle to be sold on the beef market in the regular course of their business.

The manner in which petitioners conducted their cattle business bears some resemblance to the way in which the taxpayer in the *Albright* case, *supra*, conducted his hog raising business. There, the brood sows were all sold each year after producing one litter of pigs. However, as the court emphasized in its opinion, the evidence was that that was the common practice in the hog raising business in that locality. There is no evidence that there has ever been among cattle breeders a common practice of selling off all of the cows from a breeding herd each year after a single crop of calves.

In *Isaac Emerson*, *supra*, the gains were from sales of cattle from a dairy herd and hogs from a breeding herd as in the *Albright* case. We said:

We agree with the appellate court [in the *Albright* case] that a dairy farmer is not primarily engaged in the sale of beef cattle and the sale by him of some of the stock from his dairy herd is not a sale of property held primarily for sale to customers in the ordinary course of his business.

In *Fawn Lake Ranch Co.*, *supra.*, the gains were from the sale of surplus cattle from the taxpayer's breeding herd which was kept separate from the other cattle held for sale to customers in the regular course of business. Only surplus cattle were sold as necessary to maintain the breeding herd at its required number.

We think that the respondent was correct in treating petitioners' gains from the sale of JA cattle as ordinary income.

Since, as we have found, the JA cows were held by petitioners for sale to customers in the regular course of business, no depreciation is allowable on them, and the respondent correctly so determined.

This leaves the question of the proper basis to be used in computing petitioners' gains from the sale of cattle in certain groups, as set out in the findings above. In their returns petitioners had long followed the practice of deducting the entire cost of each group of cattle purchased from the first sales out of that group. In auditing petitioners' 1945 returns respondent required petitioners to allocate a portion of the cost of each group to each cow in the group. Petitioners now concede that this change in their accounting method was required in order correctly to reflect their annual income.

In their 1945 partnership return petitioners had not claimed any basis for the cattle sold from certain of the groups where the cost of all the cattle in those groups had been deducted from the 1944 sales. The respondent made no adjustment of the 1945 return in this respect and made no adjustment in the 1944 return in which the excessive bases had been used for the cattle sold in that year.

In *Commissioner* v. *Laguna Land & Water Co.*, 118 Fed. (2d) 112, the Circuit Court of Appeals for the Ninth Circuit held, affirming on this point a memorandum opinion of this Court, that the taxpayer in computing the gain on the sale of parcels of real estate was entitled to use as a cost basis an aliquot portion of the cost of the entire tract when purchased, plus a portion of the cost of improvements to the entire tract, notwithstanding that the original cost of the whole tract had been deducted by the taxpayer in computing the gain from the sale of some of the lots in prior years. There, as in the instant case, the statute of limitations barred the assessment of any additiontal taxes for the prior years. The court pointed out that the sale of each lot was a separate transaction and rejected the Commissioner's contention that because the taxpayer had recovered the cost of the entire tract in computing its gains on sales in prior years it was not entitled to use any cost basis for the remaining lots sold in the taxable year.

In *Commissioner* v. *Cedar Park Cemetery Association, Inc.*, 183 Fed. (2d) 553, the Court of Appeals for the Seventh Circuit followed the *Laguna Land & Water Co.* case, *supra*, affirming on this point a memorandum opinion of this Court. Both of those cases involved the sale of real estate lots. However, the same rule was applied as to sales of shares of stock in *John B. Hollister*, 44 B. T. A. 851. The rule is no less applicable, we think, to sales of cattle. The fact that petitioners have used improper bases in computing their gains on sales of cattle in 1944 does not deprive them of their right to use a correct basis in computing their gains on the 1945 sales.

There is no factual support for respondent's formal plea of estoppel. See *Wobber Brothers*, 35 B. T. A. 890; *John B. Hollister*, *supra*.

We think that petitioners' gains on the sale of cattle described in the findings of fact as "#2 Mt. Dora," "#3 Heifers," "#4 JA Cattle" and "#5 Steers" should be recomputed with the allowance of a basis for each head of cattle sold equal to an aliquot portion of the cost of the entire group, as shown in petitioners' books.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*