HENRY C. BECK BUILDERS, INC., ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 90101, 90102, 90108, 90109. Filed February 18, 1964.

*W. J. McFarland, Harry R. Horrow, David P. Brown,* and *Sam G. Winstead,* for the petitioners.
*John Hargrove,* for the respondent.

---

[1] Proceedings of the following petitioners are consolidated herewith: First National Bank in Dallas and Henry C. Beck, Jr., Trustees under the will of Henry C. Beck, Deceased, docket No. 90102; Salina Management Co., Inc., a dissolved corporation, docket No. 90108; and Utah Construction & Mining Co., as a transferee of the assets of Salina Management Co., Inc., a dissolved corporation, docket No. 90109.

OPINION

TRAIN, *Judge:* Respondent determined a deficiency in income tax of petitioner Salina Management Co., Inc. (docket No. 90108), in the amount of $129,673.89 for its taxable year ended June 30, 1957.

Respondent further determined that the remaining petitioners were liable, as transferees, for Salina Management Co., Inc.'s deficiency, as follows:

Henry C. Beck Builders, Inc. (docket No. 90101) _____ $41, 436. 06
First National Bank in Dallas and Henry C. Beck, Jr., Trustees
   under the will of Henry C. Beck, Deceased (docket No. 90102) _____ 10, 631. 86
Utah Construction & Mining Co. (docket No. 90109) _____ 52, 067. 92
                                                                     _____
   Total _____ 104, 135. 84

The issues remaining to be decided relate to the deficiency determined against the transferor: [2]

(1) Whether a parent corporation's intercompany profit eliminated in a prior taxable year in a consolidated income tax return is realized by the parent corporation and taxable as ordinary income upon the sale of the stock of the subsidiary to a purchaser outside the affiliation; and

(2) Whether the basis of the parent's investment in the preferred and common stock of the subsidiary-affiliate is to be reduced, on redemption or sale, by certain losses of the subsidiary which were incurred during the period of affiliation, and, if so, to what extent such basis is to be reduced.

The facts in this case have been fully stipulated and are hereby found as stipulated.

Petitioner Henry C. Beck Builders, Inc. (hereinafter sometimes referred to as Builders), is a corporation with its principal place of business in Dallas, Tex. Petitioners First National Bank in Dallas and Henry C. Beck, Jr. (hereinafter sometimes referred to as Trust), are cotrustees of a trust created under the will of Henry C. Beck, deceased, with their principal places of business in Dallas, Tex. Petitioner Utah Construction & Mining Co. (formerly Utah Construction Co., hereinafter sometimes referred to as Utah) is a Delaware corporation with its principal office in San Francisco, Calif.

Builders, Trust, and Utah are transferees of a dissolved corporation, i.e., petitioner Salina Management Co., Inc., hereinafter sometimes referred to as Management. Its principal office was at Salina, Kans. Management's income tax return for its taxable year ended

---

[2] On brief, the alleged transferees concede that they are transferees of Salina Management Co., Inc.'s assets in the amounts of their respective alleged liabilities.

June 30, 1957, was filed with the district director of internal revenue at Wichita, Kans.

Management was incorporated in Kansas on August 18, 1952, and completely dissolved on March 27, 1958. During this period its stock was owned as follows:

| | Aug. 18, 1952, to Feb. 4, 1956 | Feb. 4 to July 24, 1956 | July 24, 1956, to Mar. 27, 1958 |
|---|---|---|---|
| Preferred stock: | | | |
| Utah | 150 | 150 | 150 |
| Henry C. Beck Co | 150 | 150 | 0 |
| Builders | 0 | 0 | 150 |
| Common stock: | | | |
| Utah | 100 | 100 | 100 |
| Henry C. Beck Co | 100 | 67½ | 0 |
| Builders | 0 | 0 | 67½ |
| Trust | 0 | 32½ | 32½ |

Salina Homes, Inc. (hereinafter sometimes referred to as Homes), was incorporated in Kansas on August 18, 1952. During the period August 18, 1952, to Otcober 31, 1956, its 280 shares of preferred stock were owned entirely by Management and its common stock was owned as follows:

| Common stock (class A) | Aug. 18, 1952, to Mar. 30, 1954 | Mar. 30, 1954, to Oct. 31, 1956 |
|---|---|---|
| Management | 95 | 100 |
| R. H. Hopkins | 5 | 0 |

The 95 shares of Homes common stock had an original cost basis to Management of zero. The five shares of common stock originally issued to R. H. Hopkins were purchased from him by Management on March 30, 1954, for $1,750. The preferred stock was received by Management upon the incorporation of Homes in exchange for unimproved real property having a basis to Management at that time of $23,471. The preferred stock had a par value of $100, did not carry voting rights, and was limited as to dividends.

Management was organized to construct and manage a 150-dwelling-unit housing project situated near Salina, Kans., and known as the "Beck-Utah Development, Edgemere Addition to the City of Salina, Kansas," hereinafter sometimes referred to as the Project. Homes was organized to own and finance the construction of the Project.

Pursuant to an agreement of August 2, 1952, with Homes, Management constructed the Project for Homes. Construction was completed during the fiscal year ended June 30, 1953, at a cost to Management of $998,402.05. Homes paid Management $1,275,308.95 for constructing the Project. The entire amount was financed by Homes

by means of a U.S. Government-insured loan from the Federal National Mortgage Association and secured by the Project.

Management recorded its $276,906.90 profit from the Project's construction on its books of account and on its Federal income tax returns to the extent of $273,780.09 during its taxable year ended June 30, 1953, and $3,126.81 during its taxable year ended June 30, 1954. The entire profit was eliminated in determining consolidated net (or taxable) income on the consolidated returns filed by Management and Homes for their taxable years 1953 and 1954. In computing depreciation on the Project for its taxable years ended June 30, 1953 through 1957, Homes used a cost basis of $998,402.05, that being Management's cost for the Project.

At all times here material Homes owned the Project, and Management performed all the requisite management services. Management's activities were confined almost exclusively to the construction and management of the Project.

On or about July 27, 1956, Homes redeemed and retired all its outstanding preferred stock for $28,000. Management reported on its June 30, 1957, return a gain of $4,529 ($28,000 received less $23,471 cost basis) on the redemption.

On or about October 31, 1956, Management sold all of the outstanding common stock of Homes to an unrelated party, Housing Service Corp. (hereinafter sometimes referred to as Housing), for $25,000. Management reported on its June 30, 1957, return a gain of $23,250 ($25,000 received less $1,750 cost basis) on the sale.

Within a few days after Housing purchased the Homes common stock from Management, Housing liquidated Homes and received its assets (principally, the Project) subject to its liabilities, including the outstanding balance of $733,516.87 on the Project construction loan.

After the sale of the Homes common stock, Management became completely inactive and was dissolved on March 27, 1958.

The following schedule reflects the taxable or net income (or loss) of Management and Homes, after elimination of all intercompany transactions and after giving effect to respondent's adjustments agreed to in connection with his audit of the 1953 and 1954 consolidated income tax returns, for each of the taxable years ended June 30, 1953 through 1957:

| Taxable year | Management | Homes | Consolidated |
|---|---|---|---|
| 1953 | ($573. 86) | ($25, 506. 02) | ($26, 079. 88) |
| 1954 | (696. 78) | 19, 348. 92 | 18, 652. 14 |
| 1955 | 5, 335. 47 | 4, 916. 53 | 10, 252. 00 |
| 1956 | 168. 54 | (11, 108. 36) | (10, 939. 82) |
| 1957 | 26, 412. 34 | [1] 1, 538. 63 | 27, 950. 97 |
| Totals | 30, 645. 71 | (10, 810. 30) | 19, 835. 41 |

[1] Homes' income from July 1 through Oct. 31, 1956, the date on which the affiliation was broken.

During Management's taxable years ended June 30, 1957, and March 27, 1958, Utah, Builders, and Trust, then constituting all of Management's shareholders, received distributions, all of which were in cash, with respect to their Management common and preferred stock as follows:

| Date | Stockholder | Amount |
|---|---|---|
| Feb. 28, 1957 | Builders | $17, 250. 00 |
| Do | Utah | 23, 750. 00 |
| Do | Trust | 6, 500. 00 |
| July 15, 1957 | do | 1, 950. 00 |
| Do | Utah | 6, 000. 00 |
| Do | Builders | 4, 050, 00 |
| April 14, 1958 | Utah | 15, 604. 50 |
| Do | Builders | 15, 604. 40 |
| Do | Utah | 6, 713. 42 |
| Do | Trust | 2, 181. 86 |
| Do | Builders | 4, 531. 56 |
| Total | | 104, 135. 84 |

The above-listed amounts reflect various distributions paid to the shareholders of Management for which the shareholders paid no consideration. As a result of such distributions, Management was left without assets. Immediately subsequent to the distributions made to its shareholders on February 28, 1957, Management retained as its only asset $56,635.84 in cash which was thereafter distributed to its shareholders by Management as indicated by the above schedule.

In the deficiency notice to Management, dated September 7, 1960, respondent determined that for the taxable period ended June 30, 1957, the $276,906.90 Project construction profit eliminated from the earlier returns constituted ordinary income to Management on the occasion of its sale of Homes stock to Housing. This additional income was reduced in the notice by "the excess of depreciation on the houses based on the construction price before the intercompany elimination over depreciation based on the construction price reduced by the intercompany elimination." Depreciation was allowed on the eliminated profit at the rate of $3\frac{1}{3}$ percent per year for $3\frac{3}{4}$ years, for a total of $34,613.36, leaving a net adjustment of $242,293.54 on account of this intercompany transaction.

### Issue 1—Intercompany Profit

Respondent maintains that Management's previously eliminated intercompany profit must be taxed upon Management's sale of the Homes stock, else the profit escapes taxation altogether—a result contemplated by neither the statute nor respondent's regulations. Petitioners argue that they followed the regulations and that there is no authority in either the regulations or the statute for taxing, in the

year the stock of the subsidiary is sold, the previously eliminated intercompany profit.

We agree with petitioners.

Respondent agrees that Management properly eliminated from its consolidated return for the fiscal year ended June 30, 1953, the intercompany profit it received that year on the construction of the Project.[3] There is no suggestion that the $3,126.81 eliminated from the following year's return for the same reason was not also properly so eliminated.

Although section 1502 of the Internal Revenue Code of 1954 [4] gives respondent the power to provide by regulation for the proper determination of the tax liability of groups filing consolidated returns "both during and after the period of affiliation," respondent has not yet chosen to promulgate any regulation providing for the tax treatment he advocates in this case.

Section 1.1502–3, Income Tax Regs.,[5] states that other law will be looked to where the regulations are silent on the matter at issue. Other law does not permit inclusion in 1957 income of an item accrued in 1953 merely because the item was not taxed in 1953. *Hurtz* v. *United States*, ——Ct. Cl. ——, —— F. 2d —— (July 12, 1963); *Commissioner* v. *Dwyer*, 203 F. 2d 522 (C.A. 2, 1953) (collecting cases,

---

[3] Sec. 24.31(b)(1)(i), Regs. 129, substantially identical to sec. 1.1502–31(b)(1)(i), Income Tax Regs., provides:

Sec. 24.31 Bases of tax computation.—In the case of an affiliated group of corporations which makes, or is required to make, a consolidated return for any taxable year, and except as otherwise provided in these regulations, the tax liability determined under section 24.30 shall be determined subject to the definitions and rules of computation set forth in paragraphs (a) and (b) of this section.

\* \* \* \* \* \* \*

(b) *Computations.*—In the case of affiliated corporations which make, or are required to make, a consolidated return, and except as otherwise provided in these regulations—

(1) *Net income.*—The net income of each corporation shall be computed in accordance with the provisions covering the determination of net income of separate corporations, except—

(i) There shall be eliminated unrealized profits and losses in transactions between members of the affiliated group and dividend distributions from one member of the group to another member of the group (referred to in these regulations as intercompany transactions);

[4] Unless otherwise specified, all statutory references are to the Internal Revenue Code of 1954.

SEC. 1502. REGULATIONS.

The Secretary or his delegate shall prescribe such regulations as he may deem necessary in order that the tax liability of any affiliated group of corporations making a consolidated return and of each corporation in the group, both during and after the period of affiliation, may be returned, determined, computed, assessed, collected, and adjusted, in such manner as clearly to reflect the income-tax liability and the various factors necessary for the determination of such liability, and in order to prevent avoidance of such tax liability.

[5] Sec. 1.1502–3 Applicability of other provisions of law.

Any matter in the determination of which the provisions of the regulations under section 1502 are not applicable shall be determined in accordance with the provisions of the Code or other law applicable thereto.

at footnotes 3, 6, and 7, on the impropriety under the 1939 Code of including, in the year the Commissioner changed the taxpayer's method of reporting income, the income that had been earned in prior years); *Leonard C. Kline*, 15 T.C. 998 (1950) (basis from an earlier lump-sum acquisition must be properly allocated to items sold during the taxable year, even though the entire basis had previously been applied to items sold during the preceding taxable year); *Policy Holders Agency, Inc.*, 41 T.C. 44 (1963) (unclaimed premium refunds transferred to surplus in 1958 were not includable in 1958 income because they should have been taxed in earlier years). The only exception to this rule that we regard as arguably relevant here relates to change of accounting method.

Respondent urges that elimination of intercompany profits under section 1.1502–31(b)(1)(i), Income Tax Regs., and carryover of basis under section 1.1502–38(b), Income Tax Regs.,[6] constitute a method of accounting which, under section 1.1502–31(b)(1), Income Tax Regs.,[7] the taxpayers may change, with the Commissioner's permission. Respondent concludes from this that, when the method prescribed by the regulations fails to properly reflect income, he may compel a change of accounting method under the provisions of section 446(b).[8]

We are not prepared at this point to agree that the foregoing constitutes a method of accounting. We are even less ready to agree that Management's method has been changed simply because there are no longer any transactions of the sort dealt with by the former "method of accounting."[9] However, even were we to agree, *arguendo*, with respondent's approach, at best it proves too much. The change is being made for the taxable year ending June 30, 1957; it clearly was not initiated by the taxpayer, and it involves adjustments in respect

---

[6] Sec. 1.1502–38 Basis of property.

(b) *Intercompany transactions.* The basis prescribed in paragraph (a) of this section shall not be affected by reason of a transfer during a consolidated return period, other than upon liquidation as provided in paragraph (c) of this section (whether by sale, gift, dividend, or otherwise) from a member of the affiliated group to another member of such group.

[7] For the purpose of the regulations under sec. 1502, a transaction not involving a sale or exchange of a capital asset or of property subject to the provisions of sec. 1231 shall not be considered an intercompany transaction if such transaction occurs in the regular course of the trade or business of the members of the group and if such members adopt, with the consent of the Commissioner and subject to such conditions as he deems proper, a consistent accounting practice of taking into account in the computation of consolidated taxable income the gains and losses reflected in such transactions, * * *

[8] SEC. 446. GENERAL RULE FOR METHODS OF ACCOUNTING.

(b) EXCEPTIONS.—If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income.

[9] Since the affiliation has been broken, there is nothing that can be properly described as an intercompany transaction and so there can be no *change* in the method of treating intercompany transactions.

of the taxable years ending June 30, 1953, and June 30, 1954. Thus, section 481(a)[10] specifically forbids the adjustments here at issue.[11]

This disposition of respondent's accounting method argument makes it unnecessary to consider the relevance to that argument of respondent's citation of *Jud Plumbing & Heating, Inc.*, 5 T.C. 127 (1945), affd. 153 F. 2d 681 (C.A. 5, 1946), and *Standard Paving Co.*, 13 T.C. 425 (1949), affd. 190 F. 2d 330 (C.A. 10, 1951).

Respondent's citation of *Ilfeld Co.* v. *Hernandez*, 292 U.S. 62 (1934), is also not helpful. In that case the Supreme Court disallowed deduction of a corporation's loss on its investments (stock cost plus advances) in two subsidiaries with which it had filed consolidated returns. The Court determined that the regulations upon which the taxpayer there relied for its deductions were not applicable; that other applicable regulations forbade deduction of the losses; and that the taxpayer already had the benefit in prior years of offsetting against its income the operating losses of the subsidiaries that had caused the investment losses sought to be deducted in the year before the Court. (Cf. *Mary E. Burrow Trust*, 39 T.C. 1080 (1963), on appeal (C.A. 10, Aug. 13, 1963), where the same expense was allowed by statute as a deduction in the computation of two different taxes.) Here, the one occasion for including the income properly accrued in the earlier year was required by the Commissioner's regulations to be bypassed. The regulations provide that the eliminated income would reduce the basis for depreciation or sale of the Project by Homes. The additional tax due on account of this reduced depreciation during Homes' ownership of the Project was paid. There is no other occasion provided for in the regulations or the Code for taxing the previously eliminated profit. And, as indicated above, general income tax law is opposed to inclusion of the 1953 income in Management's 1957 taxable year.

This Court has already ruled in a situation where the parent corporation suffered an eliminated loss on a transfer to a subsidiary with which the parent filed a consolidated return and the parent thereafter

---

[10] SEC. 481. ADJUSTMENTS REQUIRED BY CHANGES IN METHOD OF ACCOUNTING.

(a) GENERAL RULE.—In computing the taxpayer's taxable income for any taxable year (referred to in this section as the "year of the change")—

(1) if such computation is under a method of accounting different from the method under which the taxpayer's taxable income for the preceding taxable year was computed, then

(2) there shall be taken into account those adjustments which are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted, *except there shall not be taken into account any adjustment in respect of any taxable year to which this section does not apply unless the adjustment is attributable to a change in the method of accounting initiated by the taxpayer.* [Emphasis supplied.]

[11] Under sec. 7851(a)(1)(A), sec. 481 "shall apply only with respect to taxable years beginning after December 31, 1953, and ending after the date of enactment of this title, [Aug. 16, 1954]."

disposes of the subsidiary during the same taxable year. In *Fidelity National Bank & Trust Co.*, 14 B.T.A. 904 (1928), affd. 39 F. 2d 58 (C.A. 8, 1930), the parent corporation claimed a loss. Its argument was described by the Circuit Court of Appeals as follows (39 F. 2d at 62):

It is conceded by appellant that "if one member of an affiliated group sells to another member of the group some of its tangible corporate assets, and the affiliation continues throughout the year, no gain or loss results." But appellant contends that if the affiliation comes to an end before the termination of the year, a loss or gain may result; or as applied to the instant case: "If the appellant and the Concordia Loan & Trust Company be treated as one corporation during the first five months of 1919 (the period of the affiliation), there is perhaps no sale of the Salina Northern securities on February 15. But when on May 31 the Concordia withdraws, taking the securities and leaving $95,000 in place of them, as of that date, a sale to the Concordia is effected. The transfer on the 15th, plus the dissolution [of the affiliation], completes a final sale and disposition of the securities to outside interests, unaffiliated."

This Court's reply to that argument was (14 B.T.A. at 907):

The sale which gives rise to the question of loss occurred in February, 1919, while the affiliated status existed and respondent holds that under these circumstances the transaction must be considered one between affiliated companies with neither loss nor gain resulting. It is our opinion that in this determination the respondent is correct, and that this is true regardless of the fact that subsequently and during the same calendar year the affiliated status was dissolved.

The Circuit Court of Appeals, affirming, objected to the requirement of keeping intercompany transactions "open" until it was seen what happened to the affiliated status between the parties to those transactions.

Respondent's arguments in the case now before us are contrary to, and would appear to require the overruling of, *Fidelity National Bank & Trust Co.*

Respondent's efforts to distinguish that case amount to (1) speculation that one or both of the transfers involved in that case were disregarded by the courts as being sham transactions; (2) speculation that the second transfer was only a distribution to stockholders; (3) argument that that case involved the possible waste of an otherwise deductible loss while the instant proceeding involves an "escape of revenue"; and (4) argument that allowing deduction of the loss would have amounted to "a double deduction, for any decrease in the value of the Salina securities while within the affiliated group was necessarily reflected in a reduced selling price of the Concordia stock on its sale at an arms length price." The first two theories are speculations not supported by the opinions of this Court and the Circuit Court of Appeals. The third suggested distinction between the cases

is not recognized by us as a valid ground for refusing to apply the laws with an even hand.

The fourth suggested distinction misdescribes the facts of *Fidelity*. The decrease in value of the Salina stock (the property transferred from the parent to the subsidiary) sought to be deducted, occurred *before* Concordia (the subsidiary) acquired the stock. Consequently, such decrease could not have been reflected as a decrease in the value of the Concordia stock which would have been realized and perhaps [12] recognized on Fidelity's transfer of the Concordia stock. In any event, neither this Court nor the Circuit Court of Appeals, in affirming our decision, suggested that the possibility of a double tax benefit was a consideration in the decision of that case. Indeed, the argument of the Commissioner's attorney at the trial before the Board in *Fidelity* made it quite clear that the Commissioner's view was that the loss was properly eliminated as an intercompany transaction when Concordia purchased the stock and that no event occurring thereafter, whether or not in the same taxable year, could cause the loss to be recognized.

We need not determine whether a different decision on the facts of *Fidelity* would be required by respondent's current regulations providing that "Intercompany profits and losses which have been realized by the group through final transactions with persons other than members of the group * * * shall not be eliminated." Sec. 1.1502–31(b)(1), Income Tax Regs. Respondent concedes that this provision does not control the case before us "because the final transaction with the outside party did not occur until after the return was filed for the year in which the intercompany profit was earned." Consequently, even if the *Fidelity* approach is no longer applicable to the facts of that case, that approach does seem to dictate the result in this case.

Thus, principles of consolidated returns law heretofore successfully urged upon us by respondent combine with the general annual accounting period principle to foreclose recognition, in the only year before us, of the previously eliminated intercompany profit.

Respondent relies upon *Burnet* v. *Aluminum Goods Co.*, 287 U.S. 544 (1933), where the Supreme Court determined that the loss claimed by the taxpayer was allowable despite the Commissioner's claim that it should be eliminated as being incurred in an intercompany trans-

---

[12] In decisions prior to *Fidelity*, the Board of Tax Appeals had held that a sale by a parent corporation of the stock of an affiliated subsidiary to outsiders was to be treated as a sale by the parent of its own stock. Neither gain (*Farmers Deposit National Bank*, 5 B.T.A. 520 (1926)) nor loss (*Baker-Vawter Co.*, 7 B.T.A. 594 (1927) ; *Remington Rand, Inc.*, 11 B.T.A. 773 (1928)) was to be recognized on the sale. This approach was overturned, after our decision in *Fidelity*, by the Second Circuit Court of Appeals' reversal in *Remington Rand, Inc.* v. *Commissioner*, 33 F. 2d 77 (1929).

action. The Court there declined to determine whether it was so incurred. The Court noted that the regulations then applicable (arts. 77 and 78, Regs. 41) did not purport to disallow losses arising out of intercompany transactions. It declared that in any event the taxpayer and the affiliated group suffered a loss, deduction of which should be allowed on general accounting principles *in the year of the loss.* Here the regulations specifically eliminated the gain in the year in which it arose while respondent seeks to include that gain in another year.

*American Water Works Co.* v. *Commissioner,* 243 F. 2d 550 (C.A. 2, 1957), affirming in part and reversing in part 25 T.C. 903 (1956), cited by respondent, points up the inadequacy of respondent's position. In that case, the first issue (the one on which this Court was affirmed) involved the question of whether a parent corporation's basis in its subsidiary's stock should be reduced by the amount of capital distributions to the parent during consolidated return years. The taxpayer made two arguments on that issue: (1) That if an adjustment for distributions from capital during consolidated return years was intended by the regulations, they would have contained an express provision to that effect; (2) that other sections of Regulations 104 indicated that no such adjustment was to be made. 243 F. 2d at 554. The taxpayer's first argument was summarily dismissed by the Court of Appeals on the ground that the reference in section 23.34(c), Regs. 104, to adjustments "in accordance with the Code" was enough to bring these distributions within the coverage of sections 113(b)(1)(D) and 115(d) of the 1939 Code. Those Code sections clearly required the adjustments made by the Commissioner. The Court of Appeals dismissed the taxpayer's second argument on this issue by noting that the regulations the taxpayer relied upon could not fairly be construed to forbid the adjustments made by the Commissioner. In the course of dismissing this argument the Court of Appeals commented that "It is clear that Congress intended no such 'windfall' when it enacted provisions permitting corporations to file consolidated returns." 243 F. 2d at 555. The taxpayer's approach in that case would permit a parent corporation to avoid tax on appreciation in the value of a subsidiary's stock merely by causing the subsidiary to make capital distributions to the parent immediately prior to the parent's sale of the stock in amounts sufficient to reduce the value of the stock down to the parent's basis.

On brief, respondent appears to suggest that this statement of the Court of Appeals, made in the course of its rejection of the second argument, was a major reason for its rejection of the taxpayer's first argument; in other words, that a congressional intention to avoid a windfall would be treated as sufficient authority for the courts to supply an omission in the consolidated return regulations. The opinion

of the Court of Appeals contains no authority for this construction. To the extent there was an omission in the regulations, that omission was quite clearly made up for in the reference to Code sections specifically applying to the type of transaction there at issue. The court found that the supposedly conflicting regulations relied upon by the taxpayer clearly did not in fact conflict with the Commissioner's adjustments.

Here, the reference to Code provisions does not help respondent, for the Code does not authorize, under the circumstances here present, inclusion in one year of income concededly earned in another year but not reported in that other year. Here, too, the Commissioner impliedly concedes that his consolidated returns regulations conflict with his adjustments, for he insists on the right, under section 446(b), to set aside both his regulations requiring elimination of intercompany profits and his regulations requiring a carryover of basis where there has been an intercompany transfer.

We are left with a situation where Management has taken advantage of a tax benefit (elimination of intercompany profits) offered by respondent and has successfully avoided corresponding tax detriments (lower basis for depreciation and sale) by a series of real transactions resulting in permanent transfer of Homes and the Project to an unrelated party. Essentially, respondent maintains that Management's construction profit must be taxed on the sale of Homes stock or that profit will forever escape taxation.[13]

We are not slow to look through a transaction and demand persuasive evidence of its reality or bona fides. See, e.g., *Warren Brekke*, 40 T.C. 789 (1963); *National Lead Co.*, 40 T.C. 282 (1963), on appeal (C.A. 2, Sept. 29, 1963); *David L. Lieb*, 40 T.C. 161 (1963); *Carl Shapiro*, 40 T.C. 34 (1963); *Joseph H. Bridges*, 39 T.C. 1064 (1963), affd. 325 F. 2d 180 (C.A. 4, 1963); *Victor H. Heyn*, 39 T.C. 719 (1963). On the other hand, the doctrine that a taxpayer may arrange his affairs to minimize his taxes, so long as the form he chooses properly reflects the substance of his transactions, is well established. E.g., *Hanover Bank* v. *Commissioner*, 369 U.S. 672, 688 (1962); *U.S.* v. *Cumberland Pub. Serv. Co.*, 338 U.S. 451, 455 (1950); *United States* v. *Isham*, 17 Wall. (84 U.S.) 496, 506 (1873); *Albert W. Badanes*, 39 T.C. 410, 416 (1962); *Arthur J. Kobacker*, 37 T.C. 882, 893 (1962); *Atchison, Topeka & Santa Fe Railway Co.*, 36 T.C. 584, 597–598 (1961); *L. Lee Stanton*, 34 T.C. 1, 8 (1960).

There is no dispute that the property was built for the amount claimed, that Homes paid a reasonable price to Management for the

---

[13] Management's liquidation, 1½ years after its sale of Homes stock, apparently did not qualify under the nonrecognition provisions of secs. 332 and 334. To the extent, then, that Management retained any profit from the Project construction, that profit was taxed once.

construction of the property, and that it really was disposed of to an independent party in an arm's-length transaction. Respondent stresses the fact that this party then liquidated Homes and presumably took the Project at a stepped-up basis under section 334(b)(2).[14] But the purchaser was merely taking advantage of a benefit specifically provided for by the Code. What it did after its bona fide purchase should not affect the tax of the seller.

Respondent has broad power to amend his regulations. He must have known of this "loophole" before the deficiency notice was sent in this case. Revenue Ruling 60-245, 1960-2 C.B. 267, involving an almost identical set of facts, appeared 2 months before the date of the notice. Respondent there cited no provision of the Code or regulations to support his view that the parent should be taxed on the previously eliminated profit when the parent disposed of the subsidiary's stock.[15] Respondent's reluctance to use his conceded power in this area to set forth rules of general application (see Friendly, "The Gap in Lawmaking—Judges Who Can't and Legislators Who Won't," 63 Col. L. Rev. 787, 792 *et seq.* (1963)) does not justify in

---

[14] SEC. 334. [I.R.C. 1954] BASIS OF PROPERTY RECEIVED IN LIQUIDATIONS.
  (b) LIQUIDATION OF SUBSIDIARY.—

    \*        \*        \*        \*        \*        \*        \*

    (2) EXCEPTION.—If property is received by a corporation in a distribution in complete liquidation of another corporation (within the meaning of section 332(b)), and if—

      (A) the distribution is pursuant to a plan of liquidation adopted—
        (i) on or after June 22, 1954, and
        (ii) not more than 2 years after the date of the transaction described in subparagraph (B) (or, in the case of a series of transactions, the date of the last such transaction); and
      (B) stock of the distributing corporation possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote, and at least 80 percent of the total number of shares of all other classes of stock (except nonvoting stock which is limited and preferred as to dividends), was acquired by the distributee by purchase (as defined in paragraph (3)) during a period of not more than 12 months,
then the basis of the property in the hands of the distributee shall be the adjusted basis of the stock with respect to which the distribution was made. For purposes of the preceding sentence, under regulations prescribed by the Secretary or his delegate, proper adjustment in the adjusted basis of any stock shall be made for any distribution made to the distributee with respect to such stock before the adoption of the plan of liquidation, for any money received, for any liabilities assumed or subject to which the property was received, and for other items.

[15] On brief, respondent's counsel seeks to rely upon this ruling and states that the fact that this pronouncement is a ruling rather than a regulation "is without controlling significance." By letter sent after the briefs had been received, respondent properly denied any "intention to indicate in any manner whatsoever that a revenue ruling is the equivalent of or entitled to the same force and effect as a regulation." See *Pauley* v. *United States,* —— F. Supp. —— (S.D. Cal. 1963):

    Revenue Ruling 170, 1953-2 C.B. 141, the facts of which have been taken from the case at bar, is not binding on the Court and will not be followed. Administrative rulings cannot preempt the functions of the Court. Even if the foregoing Ruling was not taken from the facts of this case, it would have no more binding or legal force than would the opinion of any other lawyer. *Kaiser* v. *United States* (7th Cir., 1958), 262 F. 2d 367, 370; *United States* v. *Bennett* (5th Cir., 1951), 186 F. 2d 407, 410.

this case a judicial improvisation to prevent a reduction of the revenue that is problematic in both nature and amount.[16]

On this issue we hold for petitioners.[17]

### Issue 2—Gains on Redemption and Sale of Homes Stock

Respondent notes that Management received, during its taxable year 1957, a total of $53,000 on the redemption of Homes preferred stock and sale of its common stock. Management's aggregate basis for the two classes of stock was $25,221. The losses of which Homes could not have availed itself during the consolidated period (taxable years 1953 through 1957), had it then been filing separate returns, but which losses Management used to offset its gains, totaled (according to respondent) $42,731.57.[18] Respondent maintains that under section 1.1502–34, Income Tax Regs.,[19] this amount must be applied to

---

[16] In addition to the question of whether the profit should be taxed at all in 1957 there are also the questions of whether it should be taxed at ordinary rates rather than capital gain rates; whether eliminated intercompany profits of all sizes or vintages must be accounted for when the parent sells the stock; and how much of the subsidiary's stock must be sold and to whom in order to require (or permit, in the case of losses) recognition of previously eliminated profits and losses. We are reluctant to enter into this area of involved legislative and administrative policy unless compelled to do so by the controlling language of a statute or, in this case, of a "legislative" regulation.

[17] The foregoing rejection of respondent's conclusions is based upon respondent's repeated assertion that he is seeking to tax in Management's 1957 taxable year the profit eliminated from Management's 1953 and 1954 consolidated returns. Respondent does not claim that this elimination affects Management's basis in the Homes stock or otherwise increases Management's profit on the sale, and we have found no statute or regulation which authorizes or implies that the profit on the sale should be increased for that reason. The discussion on the second issue, infra, indicates how Management's basis in the Homes stock may be reduced for other reasons.

[18] Respondent lists Homes' loss for the taxable year 1957 as $30,382.64, despite the fact that it has been stipulated that Homes reported a gain, after the elimination of intercompany transactions, of $1,538.63 that year. It has also been stipulated that "Respondent has not made any other adjustments to the taxable income of the affiliated group other than those adjustments involved in this proceeding." It does not appear that respondent has made any adjustment to Homes' income for its taxable year 1957. No explanation is given for this apparent departure from the stipulations. Using respondent's approach, but with the stipulated amounts, the losses of which Homes could not have availed itself during those years, had it then been filing separate returns, but which losses Management used to offset its gains, totaled $10,810.30.

[19] Sec. 1.1502–34 Sale of stock; basis for determining gain or loss.

(a) Scope of section. This section prescribes the basis for determining the gain or loss upon any sale or other disposition (hereinafter referred to as "sale") by a corporation which is (or has been) a member of an affiliated group which makes (or has made) a consolidated return for any taxable year, of any share of stock issued by another member of such group (whether issued before or during the period that it was a member of the group and whether issued before, during, or after the taxable year 1929), and held by the selling corporation during any part of a period for which a consolidated return is made or required under the regulations under section 1502. For the basis in the case of a sale of bonds, see § 1.1502–35.

(b) Sales made while selling corporation is member of affiliated group. If the sale is made within a period during which the selling corporation is a member of the affiliated group, whether or not during a consolidated return period, and whether or not, as a result

**630**

reduce Management's basis in Homes stock—in this case to zero.[20]

Petitioners maintain that the redemption of the Homes preferred stock is governed by section 1.1502-37(a)(1), Income Tax Regs.,[21] under which Management's basis in the Homes common stock is added to its basis in the Homes preferred for the purpose of determining recognizable gain on the redemption. This results in a gain of $2,779—$28,000 received, minus the sum of $23,471 (basis in preferred) and $1,750 (basis in common). Since Management's basis in the common stock will have been completely used in the redemption, its gain on the sale of the common will be $25,000—the entire receipts on that transaction. The total gain on the two transactions would then be $27,779, equal to the aggregate of the gains Management actually reported.

Alternatively, petitioners maintain that if section 1.1502-34(b), Income Tax Regs., controls, then the downward adjustment in basis (and consequent increase in gain) should not exceed $4,233.37. This

of such sale, the issuing corporation ceases to be a member of the group, the basis shall be determined as follows:

(1) The aggregate bases of all shares of stock of the issuing corporation held by each member of the affiliated group (exclusive of the issuing corporation) immediately prior to the sale, shall be determined separately for each member of the group, and adjusted in accordance with the other provisions of subtitle A of the Code, but without regard to any adjustment under the last sentence of section 1051 relating to losses of the issuing corporation sustained by such corporation after it became a member of the group.

(2) From the combined aggregate bases as determined in subparagraph (1) of this paragraph, there shall be deducted the sum of—

(i) All losses of such issuing corporation sustained during taxable years for which consolidated income tax returns were made or were required (whether the taxable year 1929 or any prior or subsequent taxable year) after such corporation became a member of the affiliated group and prior to the sale of the stock to the extent that such losses could not have been availed of by such corporation as net loss or net operating loss in computing its net income or taxable income, as the case may be, for such taxable years if it had made a separate return for each of such years,

\*          \*          \*          \*          \*          \*          \*

reduced by any losses of the issuing corporation apportioned under this section to its stock sold or otherwise disposed of in a prior transaction, disregarding any transaction between members of the affiliated group during a consolidated income or excess profits tax return period which did not constitute a partial liquidation of the issuing corporation. For any taxable year in which the group sustained a consolidated loss not availed of in prior or subsequent years as a deduction under net loss or net operating loss provisions, the amount deducted under this subparagraph shall be further reduced by an amount equal to that proportion of such consolidated loss which the loss of the issuing corporation for the year in which such loss was sustained bears to the aggregate losses of the members of the group for such year.

[20] For the reasons set forth in fn. 18, *supra,* this approach would reduce the basis to $14,410.70.

[21] Sec. 1.1502–37 Liquidations; recognition of gain or loss.

(a) *During consolidated return period.* (1) Gain or loss shall not be recognized upon a distribution during a consolidated return period, by a member of an affiliated group to another member of such group, in cancellation or redemption of all or any portion of its stock, except—

(i) Where such distribution is in complete liquidation and redemption of all of its stock (whether in one distribution or a series) and of its bonds and other indebtedness, if any, and falls without the provisions of section 332, and is the result of a bona fide termination of the business and operations of such member of the group, in which case the adjustments specified in §§ 1.1502–34 and 1.1502–35 shall be made, and § 1.1502–36 shall be applicable;

(ii) Where such a distribution without the provisions of section 332 is one made in cash in an amount in excess of the adjusted basis of the stock, and bonds and other indebtedness, in which case gain shall be recognized to the extent of such excess; \* \* \*

is based upon the consolidated net incomes of the taxable years 1953 through 1956 and eliminates the taxable year 1957, the year within which both the redemption of the preferred stock and the sale of the common stock took place.

We agree with petitioners' alternate contention.

Section 1.1502–33,[22] Income Tax Regs., prescribes the general rule, as applicable to the facts of this case, that gain or loss shall be recognized on the sale or other disposition of stock, except as otherwise provided by section 1.1502–37, and except that basis shall be determined under section 1.1502–34. Section 1.1502–37 exempts certain transactions, but not the ones here involved, from the recognition of gain or loss. Except insofar as it requires that the bases of all classes of stock be aggregated to determine gain on the redemption of any one class of stock, section 1.1502–37 does not control the computation of the gain realized. The latter function is assumed by section 1.1502–34. Petitioners maintain that since the first exception in section 1.1502–37(a)(1) (see footnote 21, *supra*) specifically makes section 1.1502–34 applicable, while the second exception contains no reference to section 1.1502–34, it must follow that "no adjustment is required in the case of the second exception."

We cannot agree. The general rule provided by section 1.1502–34 purports to apply to "any sale or other disposition." Consequently, it would apply to both exceptions of section 1.1502–37(a)(1), even in the absence of any clause in those sections specifically making section 1.1502–34 applicable. We are left, it appears, with the choice of determining either that section 1.1502–34 was not intended to apply to a class of cases to which it purportedly applied, despite the absence of any statement providing that it did not apply to those cases, or of deciding that the clause in section 1.1502–37(a)(1)(i), upon which petitioners here rely, is mere surplusage. We regard the clause in question as surplusage rather than as an obscure method of exempting

[22] Sec. 1.1502–33 Gain or loss from sale of stock, or bonds or other obligations.

Gain or loss from the sale or other disposition (whether or not during a consolidated return period), by a corporation which during any period of time has been a member of an affiliated group which makes or is required to make a consolidated return, of any share of stock or any bond or other obligation issued or incurred by another corporation which during any part of such period was a member of the same group, shall be determined, and the extent to which such gain or loss shall be recognized and shall be taken into account shall also be determined, in the same manner, to the same extent, and upon the same conditions as though such corporations had never been affiliated except—

(a) In the case of a disposition (by sale, or in complete or partial liquidation not involving cash in an amount in excess of the adjusted basis of both the stock and the bonds and other indebtedness liquidated, or otherwise) during a consolidated return period to another member of the group (§§ 1.1502–31 and 1.1502–37) ;

(b) That the basis for determining the gain or loss, in the case of shares of stock, or in the case of bonds or other obligations, held during any part of a consolidated return period, shall be determined in accordance with §§ 1.1502–34 and 1.1502–35 ; and

(c) As provided in § 1.1502–36 (imposing certain limitations upon losses otherwise allowable upon sales of stock, or bonds or other obligations).

transactions under section 1.1502–37 (a) (1) (ii) from the operation of section 1.1502–34. Cf. *Commissioner* v. *Bilder*, 369 U.S. 499 (1962), where the Court found, from congressional committee reports, that such obscure results had actually been intended in the medical expense deduction field.

Thus far, we agree with respondent's reading of the controlling regulations.

In the dispute regarding whether the 1957 profits and losses should be eliminated from the computation of basis, all parties rely upon section 1.1502–34 (b) (2) (i), set forth in the margin at footnote 19, *supra*. Respondent stresses the requirement that basis is to be reduced by "the sum of 'all losses of such issuing corporation sustained *during taxable years for which consolidated income tax returns were made or were required* * * *.'" A consolidated return was filed for 1957 and therefore, respondent insists, that year's results should be considered in determining basis. Petitioners point out that this provision is immediately modified to require reduction in basis only on account of such losses for consolidated return years "after such corporation became a member of the affiliated group and prior to the sale of the stock * * *." The last such year prior to the redemption of the Homes preferred stock was the taxable year 1956.

The Homes preferred stock was redeemed within a month of the start of its 1957 taxable year. This redemption was not the occasion for the filing of a new return under section 1.1502–13 and did not otherwise bring that taxable year to a close. Section 1.1502–37 (a) (1) (ii) requires aggregation of the bases of both common and preferred in determining the gain upon the redemption. At the time of the redemption, Homes' last prior taxable year was clearly its 1956 taxable year. Consequently the reduction in the bases of both classes of stock is to be determined, for purposes of the redemption, by reference to the losses and profits of Homes' taxable years 1953 through 1956. It is conceded by all parties that Management's receipts on the redemption exceeded its combined basis. All the basis for the common having been used to offset gain on the redemption of the preferred, nothing remained to the common. Consequently, even if the sale of the common in October caused the taxable year 1957 to be a prior taxable year for purposes of section 1.1502–34 (b) (2) (i), [23] that taxable year could not operate to further affect Management's basis or its gain upon the sale. Cf. *Associated Telephone & Telegraph Co.* v. *United States*, 306 F. 2d

---

[23] Sec. 1.1502–31 (e), Income Tax Regs., provides that "Any period of less than 12 months for which either a separate return or a consolidated return is filed under the provisions of § 1.1502–13 shall be considered as a taxable year." Sec. 1.1502–13 (c) and (g) requires, on the facts of this case, that Management file a return for its entire taxable year 1957, including therein the income of Homes "for the period prior to the termination," and that Homes file a separate return "for the period after the time when it ceased to be a member of the group."

824, 825 (C.A. 2, 1962), affirming on this point on the opinion below, 199 F. Supp. 452, 469–477 (S.D.N.Y. 1961), where the court concluded that the consolidated returns regulations provided no rule requiring reduction in basis on account of net *capital* losses, that the regulations could not be construed as forbidding such reduction, and that other law (invoked via section 1.1502–3) required the reduction. Here, the applicable regulations set forth in great detail the procedure that must be followed regarding reduction of basis on account of net *operating* losses, we are dealing with that character of loss, and the language of the regulations guide us to the decision we have reached.

On this issue we agree with petitioners' alternate position.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

RAUM, *J.*, dissents.

———

DRENNEN, *J.*, concurring: I agree with the views set forth in the majority opinion. Since the dissenting opinion would reach the opposite result upon a theory which was not discussed in the majority opinion and was not argued by either party, I feel constrained to make these few remarks concerning the dissenting opinion.

While there would appear to be a gain realized by Management which is not being taxed to Management, the fault, if any, lies with respondent's regulations which fail to deal with the problem presented here. Moreover, given the broad regulatory authority with which the Congress undeniably has vested the respondent in this area and given the failure to use that authority, I cannot accept any theory which would find the respondent to have an inherent power to prevent avoidance of tax by an *ad hoc* determination such as is here involved.

Further, I am persuaded by the record, particularly the promulgation of Rev. Rul. 60–245, 1960–2 C.B. 267, that respondent has long been aware of the problem presented by this case. His failure to deal with it by amended regulations is due most probably to his inability to develop an acceptable solution and I believe this points up the danger of a judicial interference in what is essentially a legislative and administrative matter.

The dissenting opinion states that the term "unrealized" as used in the regulations[1] "is obviously the reverse of the 'Intercompany profits and losses which have been *realized by the group* through *final* transactions with persons *other than members of the group*'" (emphasis added in the dissent), which are not to be eliminated. If the

———

[1] Sec. 1.1502–31(b)(1) *Taxable income.* * * *

(i) There shall be eliminated unrealized profits and losses in transactions between members of the affiliated group and dividend distributions from one member of the group to another member of the group (referred to in the regulations under section 1502 as intercompany transactions) ;

use of "reverse" is intended to indicate that all eliminated inter-company profits and losses of years prior to the taxable year are to be reversed and included in income in the year in which the transaction with an outsider occurs, then I must disagree. It is for such cases that the regulations provide a carryover basis. In such cases, the individual member of the affiliated group is treated as having realized a gain measured by the difference between its receipts on the trans-action and the basis of its transferor, together with whatever adjust-ments (such as depreciation) may be appropriate. I find nothing in the law or regulations which would permit Homes to add to its basis in the project the amount of the gain respondent would now tax to Management in 1957. Had Homes sold the project to an out-sider it presumably would have realized the gain attributable to the unrealized profits of Management.[2] True, this method for preserving and ultimately taxing the gain (albeit as a capital gain and not as ordinary income) tends to produce distortion because Homes is treated as having realized all the gain even though at least a part of it should be apportioned to Management. Nevertheless, such distortion has been accepted by both the Government and those affiliated groups choosing to file consolidated returns (sec. 1.1502–1(a), Income Tax Regs.). As the excerpt from the House report appearing in footnote 1 of the dissent indicates, this was done in order to avoid "the necessity of examining the bona fides of thousands of intercorporate transac-tions."

The dissent would decide the case on the theory that "when the [mortgage] obligation of the group was satisfied and liquidated—in this instance by eliminating Homes as a group member—the gain measured by the amount collected earlier from the mortgagee was, for the first time, a free asset and includable in computing gain as part of the 'money received' for the property previously owned by the group," citing *Lutz & Schramm Co.*, 1 T.C. 682 (1943); *R. O'Dell & Sons Co.*, 8 T.C. 1165 (1947), affd., 169 F. 2d 247 (C.A. 3, 1948); and *Mendham Corporation*, 9 T.C. 320 (1947), in support of the application of this theory to the instant case. In each of those cases the taxpayer disposed of the mortgaged property itself and, as part of the transaction, the mortgage obligation to the taxpayer (in *Mend-ham* the taxpayer acquired the property in a tax-free transaction subject to the mortgage, which remained an obligation of the tax-payer's transferor) was eliminated. In each case, we held that the elimination of the obligation constituted part of the taxpayer's re-ceipts from the transaction.

But this gives no recognition to the distinction that in those cases the owner of the property not only transferred the property itself,

---

[a] Assuming that there would have been a profit on the transaction.

but an obligation of either the owner or of the property transferred was discharged, whereas in the case before us the group transferred stock and not the underlying assets or obligations. Neither was the mortgage satisfied nor did a technical defense arise to the mortgage obligations as a result of the transaction. Immediately after the stock transfer, Homes still owned the property and was still liable on the mortgage. Were Homes to then sell the property for an amount equal to the unpaid balance on the mortgage and use the proceeds to satisfy the mortgage obligation, Homes would be taxable on the difference between its new carryover basis and its proceeds. Homes would get no benefit from the respondent's proposed tax on Management. In effect, the same excess of mortgage proceeds over cost of construction would be taxed twice.

It is argued that unless the profit of Management is taxed to Management at this time it will escape taxation altogether because the purchaser of the Homes' stock was able by virtue of the provision of section 334(b)(2), I.R.C. 1954, to avoid taxation on this profit. If so, this is only because of an unrelated provision of the Internal Revenue Code over which petitioners had no control. Furthermore, the profit actually realized by Management on the construction of the project presumably would be taxed to its stockholders upon distribution thereof to them.

In my opinion the theory advanced in the dissent does not compel nor justify a different conclusion than reached by the majority. It seems to me to be an effort to apply an inapplicable theory to this particular situation to prevent what the dissenters consider would be an avoidance of tax, with no support in the law or regulations.

FISHER, TRAIN, FAY, and DAWSON, *JJ.*, agree with this concurring opinion.

---

OPPER, *J.*, dissenting: It seems to be recognized by all concerned that some quarter million dollars of income taxable under section 61 is being permitted to escape tax altogether. This can only be justified if it is unavoidable. I do not think it is.

Beneath the superficial complications of consolidated reporting, this situation seems to me to present a comparatively simple problem with which we have been called upon to deal frequently in the past. That the real issue is not explicitly developed by the parties can be at most an occasion for rehearing or reargument. It does not justify an incorrect result in a reasonably obvious context.

First, consolidated returns are, of course, not a method of accounting but a method of reporting, conferred as a privilege, *Carboloy Co.*, 18 T.C. 1028, 1030 (1952), affirmed per curiam 207 F. 2d 777 (C.A. 6, 1953), and not a requirement, upon a family of affiliated corporations

for the purpose of simplifying their tax obligations.[1]  It was clearly intended that, if elected, the method should not be the means of eliminating otherwise taxable income.[2]

Simply stated, the theory was that for tax-computing purposes the corporate entities were to be ignored and intercorporate dealings eliminated as mere bookkeeping detail until a transaction outside the family was consummated.  This is the only reasonable explanation of "unrealized" as employed in the regulation,[3] which is obviously the reverse of the "Intercompany profits and losses which have been *realized by the group* through *final* transactions with persons *other than members of the group."*  (Emphasis added.)   Sec. 1.1502–31(b)(1), Income Tax Regs.  Of course, the taxing of the separate corporate identities can be preserved by merely failing to take advantage of the optional privilege of consolidated reporting.  But where consolidated returns are elected the concept must be that the whole group is treated as one taxable entity, owning the assets and owing the external obligations of the entire group.[4]

Second, this is not a case, like those cited in the Court's opinion, where income earned and realized in one year is sought to be placed in another.  The "profit" appearing on the books in 1953 was not "realized" nor earned, nor reportable in that year for two reasons.[5]  Only when in 1957 there was a "final transaction" with a nonmember of the group—that is, when the Homes stock was sold—was there a realization, and hence an earning, of any gain which could be reported.  And, in that year, the gain should have been reported because

---

[1] "* * * consolidated statements of income have been the rule for ordinary business purposes, and for 16 years the income tax law has provided for consolidated returns.  The administration of the income tax law is simpler with the consolidated return since it conforms to ordinary business procedures; enables the Treasury to deal with a single taxpayer instead of many subsidiaries; and eliminates the necessity of examining the bona fides of thousands of intercompany transactions."  H. Rept. No. 704, 73d Cong., 2d Sess. (1934), p. 17.

[2] Sec. 1502, I.R.C. 1954.  *American Water Works Co.* v. *Commissioner,* 243 F. 2d 550 (C.A. 2, 1957), affirming on this issue 25 T.C. 903 (1956).

[3] Sec. 1.1502–31(b)(1)(i), Income Tax Regs.

[4] Petitioners appear to agree with this.  They say:

"If the affiliated group is viewed as a single entity, which respondent suggests is proper * * * as do all of the authorities he cites and with which we heartily agree, clearly the income was not earned upon completion of the housing project, for all that had occurred at that time was the construction of the project by the affiliated group for itself and the financing thereof * * *."

[5] Again, petitioners appear to agree:

"Viewed from the standpoint of substance, all that occurred here [in 1953] was a transfer of borrowed funds from one corporate division to another, and *the designation of a portion of the amount transferred as "construction profit" is meaningless for tax purposes.*  The very reason for eliminating intercompany transactions is because income cannot be considered earned as a result of self-dealing. * * *"  (Emphasis added.)

under the "other law applicable thereto" referred to in the regulations [6] the group for the first time realized a gain.

Third, when, in 1953, Homes secured an apparent profit through a mortgage greater than the cost of construction and passed this on to Management, there was no gain to the group. This was, it is true, a transaction "with persons other than members of the group." But the existence of the encumbrance represented by the mortgage offset any benefit resulting from the excess cash, and accordingly suspended its "finality." At that time,

Realization of gain was therefore postponed for taxation until there was a final disposition of the property * * *. See Lutz & Schramm Co., 1 T.C. 682; Mendham Corp., 9 T.C. 320. * * * [Emphasis added.] [Woodsam Associates v. Commissioner, 198 F. 2d 357, 359 (C.A. 2, 1952), affirming 16 T.C. 649 (1951).[7]]

But when the obligation of the group was satisfied and liquidated—in this instance by eliminating Homes as a group member—the gain measured by the amount collected earlier from the mortgage was, for the first time, a free asset and includable in computing gain as part of the "money received" [8] for the property previously owned by the group.

Since at least as early as 1943, the rule has been clearly established that when the owner of property borrows an amount in excess of his basis the borrowing constitutes a part of the amount received when the property is disposed of and the obligation of the mortgage is extinguished. The borrowing does not constitute gain when it occurs, because any receipt is offset by the accompanying liability. Thus, in Lutz & Schramm Co., 1 T.C. 682, 688, 689 (1943), court-reviewed without dissent on this issue, we said:

The net result of the transaction was that the petitioner received $300,000 for its property. The $300,000 was received by the petitioner in 1925 [when the mortgage in that amount was placed on the property], but the taxable transaction took place in 1937 when the petitioner transferred the property to the creditor in discharge of a debt of $300,000.

* * * * * * *

The fact remains that the taxable transaction took place in 1937, and the net result of it was that the petitioner, over a period of years, had enjoyed the full benefit from the receipt of $300,000 by transferring a property which had a [lower] basis in its hands for gain or loss * * *.

In R. O'Dell & Sons Co., 8 T.C. 1165, 1167 (1947), affd., 169 F. 2d 247 (C.A. 3, 1948), we stated the rule as follows:

So where an owner pledges its property for a loan, the proceeds of which are greater than its basis, and subsequently succeeds in transferring the property

[6] Sec. 1.1502–3, Income Tax Regs.
[7] This case is cited and relied on by petitioners.
[8] Sec. 1001, I.R.C. 1954.

for a cancellation of the debt, the excess of what is received over the basis of the property is gain, taxable in the year in which the property is disposed of and the debt discharged.   *Lutz & Schramm Co.* [*supra*] * * *

And in *Mendham Corporation*, 9 T.C. 320, 323, 325 (1947), as here, the loan was obtained by one member of a corporate group and subsequently eliminated by the transfer by another member.   We said:

it was not petitioner, but its transferor in a nontaxable exchange, which made the original borrowing, and hence the opening move toward that final profit. * * * [B]ecause the whole operation was within the corporate family, no tax consequence attached * * *.   Nevertheless, it is petitioner's disposition of the property, and its elimination of the mortgage debt, which concludes the operation instituted by its predecessor and furnishes the occasion for a survey of the results of the entire transaction.   Unless the transferee's situation be thought of as including the consequences of the original borrowing, that phase of the calculation will never be taken into account * * *.

*     *     *     *     *     *     *
*It seems to us to follow that petitioner must be treated here exactly as though it had itself placed the mortgage on the property and benefited by the cash so acquired.*[3]   [Footnote omitted; emphasis added.]

And see *Woodsam Associates* v. *Commissioner, supra.*

Lest it be suggested that these cases are different because there the property and the indebtedness were disposed of together, it needs only to be observed that under consolidated reporting that is precisely what happened here.   When the Homes stock was sold, all contact of the group with the project and the mortgage was severed—and for the first time.   For tax purposes, property of the group was disposed of and indebtedness of the group was simultaneously satisfied.[9]

Of course, this means capital gain treatment and not ordinary income.   The collapsible corporation section,[10] being inapplicable because one of its conditions [11] was, perhaps purposely, avoided, the transaction was capital in nature.   But what was realized here was in an amount which must include the gain from the proceeds of the mortgage.   That the presentation on behalf of petitioners is as skillful and able as one would expect from their eminent counsel may be a reason but is scarcely an excuse for the result which the Court reaches here.   I think it is incorrect.

Tietjens, Withey, and Pierce, *JJ.*, agree with this dissent.

---

[9] See footnote 4, *supra*, and see *Burnet* v. *Aluminum Goods Co.*, 287 U.S. 544, 547 (1933).

[10] Sec. 341, I.R.C. 1954.

[11] Sec. 341 (b) (3) and (d) (3), I.R.C. 1954.